## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| CA, INC. and AVAGO TECHNOLOGIES INTERNATIONAL SALES PTE. LIMITED, | § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Case No. 2:21-cv-00080-JRG-RSP |
| NETFLIX, INC., | § § | |
| *Defendant*. | § § | |

## REPORT AND RECOMMENDATION

Before the Court is Defendant Netflix, Inc.'s Motion to Dismiss for Improper Venue, or in the Alternative, Transfer to the Northern District of California. **Dkt. No. 26**. Defendant's Motion asks the Court to dismiss the above-captioned matter pursuant to 28 U.S.C. § 1406(a) or, alternatively, to transfer this case to the Northern District of California under § 1404(a).

### I.    BACKGROUND

On March 9, 2021, Plaintiffs CA, Inc. and Avago Technologies International Sales Pte. Limited (collectively, "Plaintiffs") filed their complaint against Defendant in this District. Dkt. No. 1. The Court granted two unopposed applications for extension of time for Defendant to respond to the complaint. Dkt. No. 11; Dkt. No. 12. On May 14, 2021, Defendant filed an action for declaratory judgment of non-infringement of these patents. *See Netflix, Inc. v. CA, Inc. et al.*, No. 3:21-cv-03649-EMC (N.D. Cal. May 14, 2021). On May 17, 2021, Defendant filed the present motion. Dkt. No. 26.

1

## II.    LEGAL STANDARDS

### A.  Venue

In matters unique to patent law, Federal Circuit law rather than regional circuit law applies. *In re Cray Inc.*, 871 F.3d 1355, 1360 (Fed. Cir. 2017) (citing *Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1359 (Fed. Cir. 1999)). 28 U.S.C. § 1400(b) is unique to patent law and "constitute[s] 'the exclusive provision controlling venue in patent infringement proceedings' . . . ." *Id.* (citing *TC Heartland LLC v. Kraft Foods Group Brands LLC*, 137 S.Ct. 1514, 1518 (2017) (quoting *Stonite Prods. Co. v. Melvin Lloyd Co.*, 315 U.S. 561, 563 (1942))).

Venue is proper for patent infringement suits "where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." 28 U.S.C. § 1400(b). For § 1400(b) venue by residence, a domestic corporation resides only in its state of incorporation. *TC Heartland LLC*, 137 S.Ct. at 1520. For § 1400(b) venue by a regular and established place of business, "(1) there must be a physical place in the district; (2) it must be a regular and established place of business; and (3) it must be the place of the defendant." *In re Cray Inc.*, 871 F.3d at 1360. "Where a complaint alleges infringement, the allegations 'satisfy the 'acts of infringement' requirement of § 1400(b) '[a]lthough the[] allegations may be contested.'" *Seven Networks, LLC v. Google LLC*, 315 F. Supp. 3d 933, 942 (E.D. Tex. 2017) (quoting *Symbology Innovations, LLC v. Lego Sys., Inc.*, 282 F.Supp.3d 916, 928 (E.D. Va. 2017)).

A "place of business" does not require "real property ownership or a leasehold interest in real property" and "leased shelf space or rack space can serve as a 'place' under the statute." *In re Google LLC*, 949 F.3d 1338, 1343–44 (Fed. Cir. 2020). A "place of business" generally requires an employee or agent of the defendant to conduct business at that place. *Id.* at 1344. The "agent or

employee" need not be "a human agent" and the Court left open the question of whether a machine may be an agent. *Id.* at 1347.

The Federal Circuit has held that a place of business is "of the defendant," if it is established or ratified by the defendant. *Id.* at 1363. A place may be "of the defendant" even if the defendant does not own or lease the place if the defendant exercises other attributes of possession or control over the place and "the statute could be satisfied by any physical place that the defendant could 'possess[] or control.'" *In re Google LLC*, 949 F.3d at 1343. This requirement is satisfied if the defendant "actually engage[s]" in business from the physical location in the District. *Intellectual Ventures II LLC v. FedEx Corp.*, No. 2:16-cv-00980-JRG, 2017 WL 5630023, at *7 (E.D. Tex. Nov. 22, 2017).

A party may move to dismiss an action for "improper venue." Fed. R. Civ. P. 12(b)(3). "Once a defendant raises a 12(b)(3) motion to dismiss for improper venue, the burden of sustaining venue lies with the plaintiff." *ATEN Int'l Co. v. Emine Tech. Co.*, 261 F.R.D. 112, 120–21 (E.D. Tex. 2009) (citing *Laserdynamics Inc. v. Acer Am. Corp.*, 209 F.R.D. 388, 390 (S.D.Tex. 2002).

A plaintiff may carry its burden by presenting facts, taken as true, that establish venue. *Id.* The Court "must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff." *Mayfield v. Sallyport Glob. Holdings, Inc.*, No. 6:13-CV-459, 2014 WL 978685, at *1 (E.D. Tex. Mar. 5, 2014) (citing *Ambraco, Inc. v. Bossclip, B.V.*, 570 F.3d 233, 237–38 (5th Cir. 2009)).

"[V]enue facts are to be examined as of the date the suit is filed." *Personal Audio, LLC v. Google, Inc.*, 280 F. Supp. 3d 922, 924 (E.D. Tex. 2017). The Federal Circuit has emphasized that "each case depends on its own facts" and "no one fact is controlling." *In re Cray Inc.*, 871 F.3d at 1362, 1366. If venue is improper, the Court must dismiss it, "or if it be in the interest of justice,

transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

### B.  Agency

"An agency relationship is a 'fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to act." *In re Google LLC*, 949 F.3d at 1345 (quoting Restatement (Third) of Agency § 1.01). "The essential elements of agency are (1) the principal's 'right to direct or control' the agent's actions, (2) 'the manifestation of consent by [the principal] to [the agent] that the [agent] shall act on his behalf," and (3) the 'consent by the [agent] to act.'" *Id.* (citing *Meyer v. Holley*, 537 U.S. 280, 286 (2003)).

Regarding machines as agents, the Federal Circuit has found that an ISP that provides a party with a service wherein that party has "no right of interim control over the ISP's provision of network access," performs one-time installations, and performs "basic maintenance activities" is not an agent of said party. *In re Google LLC*, 949 F.3d at 1346. Further, "as [the Federal Circuit] noted in *Cray*, the Supreme Court has cautioned against a broad reading of the venue statute." *Id.* (internal citations omitted). "The venue statute should be read to exclude agents' activities, such as maintenance, that are merely connected to, but do not themselves constitute, the defendant's conduct of business in the sense of production, storage, transport, and exchange of goods or services." *Id.*

### C.  Transfer

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to

4

any district or division to which all parties have consented." 28 U.S.C. § 1404(a). It is the movant's burden to prove that the transferee venue is "clearly more convenient" than the transferor venue. *In re Volkswagen of America, Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) ("[W]hen the transferee venue is not clearly more convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected. When the movant demonstrates that the transferee venue is clearly more convenient, however, it has shown good cause and the district court should therefore grant the transfer.")

The § 1404 convenience factors include private-interest factors and public-interest factors. *In re Volkswagen of America, Inc.*, 545 F.3d at 315. The private-interest factors include "(1) the relative ease of access to sources of proof, (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.* The public-interest factors include: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws." *Id.*

## III.    ANALYSIS

Venue is proper for patent infringement suits "where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." 28 U.S.C. § 1400(b). For § 1400(b) venue by residence, a domestic corporation resides only in its state of incorporation. *TC Heartland LLC*, 137 S.Ct. at 1520. There is no dispute that Defendant is a Delaware corporation that maintains its principal place of business at 100 Winchester Circle, Los Gatos, California 95032. Dkt. No. 26 at 12; Dkt. No. 1 at 2. Accordingly, Defendant does not reside in the Eastern District of Texas.

5

Whether Defendant has a regular and established place of business is disputed. For §
1400(b) venue by a regular and established place of business, "(1) there must be a physical place
in the district; (2) it must be a regular and established place of business; and (3) it must be the
place of the defendant." *In re Cray Inc.*, 871 F.3d at 1360.

Plaintiffs allege in their Complaint that venue is proper because Defendant has committed
acts of infringement in this District and has a regular and established place of business in this
District. Dkt. No. 1 at 3. Plaintiffs then allege as follows: Defendant uses a content delivery
network called "Open Connect" to deliver Defendant's content to its subscribers worldwide,
including in this District. *Id.* The building blocks of Open Connect are custom Netflix servers that
store Netflix video content called "Open Connect Appliances" ("OCAs"). *Id.* Defendant installs
OCAs in significant Netflix markets throughout the world to localize its video content by providing
OCAs directly to local internet service providers ("ISPs"). *Id.* Defendant provides the server
hardware and the ISPs provide power, space, and connectivity. *Id.* at 3–4. Defendant contracts
with ISPs and installs OCAs with those ISPs in physical facilities in this District and Defendant
retains control of its OCAs "by monitoring, updating, and maintaining the OCA, as well as
supplying it with specific video content." *Id.* at 4–5.

Plaintiffs allege that Defendant's ISP partners in this District act as Defendant's agents
because Defendant "for example, requires its ISP partners to 'identify a person or a set of people
who are available to perform' specific business roles for Defendant at the ISP facility to 'facilitate
the overall process' of delivering streaming video to Netflix customers." *Id.* at 5. Plaintiffs allege
that Defendant's OCA Deployment Guide explains that "the manner in which traffic is directed to
the appliance is determined explicitly by you [i.e., the ISP] and Netflix, not by the appliance itself."
*Id.* (citing https://openconnect.netflix.com/deploymentguide.pdf).   Plaintiffs   plead   that

Defendant's OCAs, which are in physical facilities in this District and deliver cached content to residents in this District, are regular and established places of business of Defendant.

Defendant argues that it gives its server hardware to ISPs who may install and use that hardware to speed up the delivery of Netflix content to the ISP's customers. Dkt. No. 26 at 8 (citing Dkt. Nos. 26-4, 26-6, 26-8, 26-10, and 26-12). Defendant asserts it then enters into software license agreements with the ISPs who accept the hardware that Netflix transfers to them. *Id.* (citing Dkt. No. 26-5). Defendant contends the software license agreements grant ISPs the right to use Netflix's software and defines the combination of Netflix's software and the transferred server as an "Appliance." *Id.* (Citing Dkt. No. 26-5).

## A. *Cray* Factors

Defendant asserts that Plaintiffs fail to allege any "physical place" owned or controlled by Netflix in this District. Dkt. No. 26 at 13. Defendants argue that Netflix neither owns nor leases real estate here, and that the hardware appliances housed by the ISP are not owned by Defendant as Defendant "irrevocably transfers ownership, title and control of the hardware appliance" to the ISP. *Id.* (citing Dkt. Nos. 26-4, 26-6, 26-8, 26-10, and 26-12).

Defendant argues that even if Defendant owned the hardware appliances, they could not establish a "regular and established place of business" here. *Id.* (citing *In re Google LLC*, 949 F.3d at 1343–45). Defendant contends that Plaintiffs recycle a theory rejected by the Federal Circuit. *Id.* at 14. Defendant does not dispute that the ISPs are located in the Eastern District of Texas, but rather argues that the ISPs are not Defendant's agents. *Id.* at 14–17. Defendant further contends that no ISP's facility is a place "of Netflix" because Defendant has no rights to any physical space in any of the ISP's locations. Dkt. No. 26 at 13.

Plaintiffs respond that Defendant's motion does not challenge CA's allegations that (1) Defendant has committed acts of infringement in this District; (2) Defendant conducts a regular-and-established business in this District by streaming video content to subscribers in this District; (3) the OCA servers that Netflix uses to deliver streaming video content to subscribers in this District are located in physical facilities in this District, and (4) the OCA servers are places of business. Dkt. No. 51 at 9–10. Plaintiffs contend Defendant's venue challenge centers on two arguments: that venue is improper because Defendant does not "own" the OCA servers and because the ISPs are not acting as Defendant's agents. *Id.* at 10.

The Court agrees with Plaintiffs' characterization of Defendant's argument. *See* Dkt. No. 57 at 3 ("Plaintiffs argue that there are two bases for venue over Netflix in this District: (1) '[t]he OCA servers are Netflix's places of business,' and (2) the Internet Service Providers with whom Netflix contracts for services in this District 'act as Netflix's agents.' Both bases for venue have been squarely rejected by the Federal Circuit."). Although venue here is determined by the *Cray* factors, the *Cray* factors in turn are determined in this instance by the facts surrounding the OCAs and their use as well as whether an agency relationship exists between Defendant and local ISPs.

### B.  OCA Possession and Control

Defendant argues that the OCAs are not a "physical place" "of Defendant" because Defendant "irrevocably transfers ownership, title and control of the hardware appliance" to the ISP. Dkt. No. 26 at 13. Plaintiffs respond that the question is not whether the Defendant "owns" the place at issue, but rather that the statute can be satisfied by any physical place that the defendant could "possess or control." Dkt. No. 51 at 10 (citing *In re Google LLC*, 949 F.3d at 1343 (quoting *In re Cray Inc.*, 871 F.3d at 1363)).

The Federal Circuit in *In re Google* made clear that "*Cray* itself recognized that a 'place of business' is not restricted to real property that the defendant must 'own[] or lease,' and that the statute could be satisfied by any physical place that the defendant could 'possess[] or control.'" *In re Google LLC*, 949 F.3d at 1343 (quoting *In re Cray Inc.* at 1363). "For example, a defendant who operates a table at a flea market may have established a place of business; the table serves as a 'physical, geographical location . . . from which the business of the defendant is carried out.'" *Id.* (citing *In re Cray Inc.* at 1362; *In re Cordis Corp.*, 769 F.2d 733, 735, 737 (Fed. Cir. 1985)).

"Similarly, leased shelf space or rack space can serve as a 'place' under the statute, as two district courts have found." *Id.* at 1343–44 (citing *Tinnus Enters., LLC v. Telebrands Corp.*, No. 6:17-CV-00170, 2018 WL 4560742, at 4*, 2018 U.S. Dist. LEXIS 79068, at *14 (E.D. Tex. Mar. 9, 2018), *report and recommendation adopted*, 2018 WL 4524119, 2018 U.S. Dist. LEXIS 78342 (E.D. Tex. May 1, 2018) (holding that "premium shelf space" leased by the defendant constituted a regular and established place of business); *Peerless Network, Inc. v. Blitz Telecom Consulting, LLC*, No. 17-CV-1725, 2018 WL 1478047, at *3, 2018 U.S. Dist. LEXIS 49628, at *8–9 (S.D.N.Y. Mar. 26, 2018) (holding that shelf space constituted a "place" under the first factor of the *Cray* test)). "Relevant considerations include whether the defendant owns or leases the place, or exercises other attributes of possession or control over the place. . . . Marketing or advertisement also may be relevant, but only to the extend they indicate that the defendant itself holds out a place for its business." *In re Cray Inc.*, 871 F.3d at 1363.

Plaintiffs argue that Defendant both controls the OCA servers and promotes them as Netflix's OCAs, each of which may make the OCAs and their locations places of Netflix under the statute. Dkt. No. 51 at 11. Plaintiffs contend that although Defendant grants ISPs title to the OCA servers, such transfer of title is illusory as Defendant retains ownership of all the software

Defendant preloads onto the OCAs before shipment to the ISPs, merely granting the ISP a license to use that software to carry out Defendant's video-streaming business. *Id.*

Plaintiffs argue convincingly that "Netflix's contention that the ISPs own the servers appears to be a legal fiction. *Id.* at n. 9. Plaintiffs contend Netflix instructs its ISP partners that they "should not attempt to modify, upgrade, or repair the appliance." *Id.* (citing Dkt. Nos. 51-3; 51-9). Plaintiffs assert that when an ISP has a defective OCA and sends it back to Defendant, Defendant attempts to repair it and put it "back into the pool of available service for redistribution to the partners," but not necessarily back to the same ISP, raising the very real question of whether the ISP actually owns the OCA if Netflix can just redirect it to a different ISP. *Id.* (citing Dkt. No. 51-9 at 90–91).[1]

Plaintiffs further contend that, according to Defendant's Open Connect Deployment Guide, "Netflix continuously monitors all deployed Netflix OCAs, including all aspects of the performance and availability of the appliance," that "[a]fter we [Netflix] deploy OCAs to a site, we constantly measure and analyze their performance and augment capacity as requirements evolve," and "[a]ll of our OCA deployments, whether in IXPs or embedded in ISP networks, are constantly monitored by the Open Connect Operations team to ensure reliability and efficiency." *Id.* at 11–12 (quoting Dkt. No. 51-2 at 33; Dkt. No. 51-1 at 3, 5; Dkt. No. 51-9 at 75).

Plaintiffs argue that in addition to the control Defendant exerts over the OCAs, Defendant also maintains tight control over how ISP partners use the OCAs with an Open Connect Deployment Guide (Dkt. No. 51-2) which indicates the requirements for certain physical connections for the OCAs, network capacity, temperature at which ISPs must keep their facilities,

---

[1] In light of economic realities and the control maintained by Netflix in the surrounding contractual language, it strikes the Court as disingenuous for Netflix to contend that "the ISPs take title to the servers, and they are free to use them as OCAs or as they otherwise see fit." Dkt. No. 57 at 4.

the direction OCAs once installed must face, the manner of inbound and outbound filtering ISPs are permitted to use for the OCAs, how they are configured, the circumstances the OCAs may be relocated one installed, and whether ISPs may keep components of the OCAs they purportedly own. *Id.* at 12–13. Further, Plaintiffs assert that Netflix's corporate representative confirmed that Netflix can wipe the software from an OCA remotely. *Id.* at 13 (citing Dkt. No. 51-10 at 101:13–16 ("Q Does Netflix have the ability to wipe the software from an OCA remotely? A Yes.")).

Plaintiffs further argue that, in addition to Defendant's possession and control over the OCAs and tight control over how ISP partners use the OCAs, Defendant ratifies the OCA servers as its own places of business by holding out the OCAs as such by consistently referring to them in marketing materials and other public statements as "Netflix OCAs" and "our OCAs." *Id.* at 14–15 (citing Dkt. Nos. 51-11, 51-5, 51-12, 51-13, and 51-2). Plaintiffs assert that Netflix represents to customers that Netflix's distributed-server network, composed of Netflix OCAs housed within local ISPs, is a critical part of its business and even specifically touts its OCAs in the Eastern District of Texas by highlighting ISPs in the District and explaining that "[t]his map of our network gives you a sense for how much this effort has scaled in the last five years." *Id.* at 15 (citing Dkt. No. 51-6)

Plaintiffs contend that Defendant's own filings in this District acknowledge that the OCAs are "Netflix Servers," quoting Defendant in *City of New Boston v. Netflix, Inc.*:

> Netflix's customers, using their own personal devices, connect to the Internet through their ISP and send requests to Netflix for particular pieces of content. The subscriber's ISP then relays that request to a Netflix Server, and Netflix delivers that content to the subscriber's ISP, which is responsible for delivering it to its customer's device.

*Id.* (quoting *City of New Boston v. Netflix, Inc.*, No. 5:20-cv-00135-RWS, Dkt. No. 10 (E.D. Tex. Oct. 2, 2020)).

Defendant does not challenge any of these factual representations by Plaintiffs in its reply. Defendant rather argues that *In re Google* establishes that for venue there must be "the regular, physical presence of an employee or other agent of the defendant conducting the defendant's business at the alleged 'place of business,' and asserts that none of Defendant's employees have a regular, physical presence at the OCA servers located in this District and contends that local ISPs are not Netflix's agents. Dkt. No. 57 at 3–4 (quoting *In re Google LLC*, 949 F.3d at 1345).

Given these unchallenged factual assertions by Plaintiff, it is clear that Defendant maintains a great deal of control over the OCAs. Although Defendant asserts it "irrevocably transfers ownership, title and control of the hardware appliance" to the ISP on paper, in practice Defendant retains control by continuously monitoring, updating, and maintaining the OCA. *See* Dkt. No. 26 at 13; *see also* Dkt. No. 1 at 4–5. Most notably, Defendant's ability to remotely delete software and even redistribute the hardware itself reveals that Defendant has sufficient possession and control over the OCAs for venue purposes. *See* Dkt. No. 51-10 at 101:13–16; *see also* Dkt. No. 51-9 at 90–91. Finally, Defendant's consistent reference to the OCAs as belonging to Defendant in its marketing materials is sufficient to ratify the OCAs as Defendant's place of business. *See* Dkt. Nos. 51-2, 51-5, 51-11, 51-12, and 51-13.

Defendant is correct that this possession and control, alone, are not sufficient to establish the OCAs are regular and established places of business of Defendant in the District. Plaintiffs do not challenge Defendant's assertion that Defendant has no employees where the OCAs are installed. *See* Dkt. No. 57 at 4. With the finding that Defendant has sufficient possession and control over the OCAs and ratifies them as its places of business, the remaining legal issue for the proper venue analysis is whether the ISPs act as agents of Defendant.

### C.  Agency

"The essential elements of agency are (1) the principal's 'right to direct or control' the agent's actions, (2) 'the manifestation of consent by [the principal] to [the agent] that the [agent] shall act on his behalf," and (3) the 'consent by the [agent] to act.'" *Id.* (citing *Meyer*, 537 U.S. at 286).  The Federal Circuit has found that an ISP that provides a party with a service wherein that party has "no right of interim control over the ISP's provision of network access," performs one-time installations, and performs "basic maintenance activities" is not an agent of that party. *In re Google LLC*, 949 F.3d at 1346. Further, "as [the Federal Circuit] noted in *Cray*, the Supreme Court has cautioned against a broad reading of the venue statute." *Id.* (internal citations omitted). "The venue statute should be read to exclude agents' activities, such as maintenance, that are merely connected to, but do not themselves constitute, the defendant's conduct of business in the sense of production, storage, transport, and exchange of goods or services." *Id.*

Defendant asserts that the present case is like *In re Google*, where the Federal Circuit rejected venue based on the theory that the ISPs in that case were Google's agents. Dkt. No. 26 at 14. In *In re Google*, the allegation of venue was based on the presence of Google Global Cache ("GGC") servers, which function as local caches for Google's data. *In re Google LLC*, 949 F.3d at 1340. Defendant argues that even with (1) contracts with the ISPs regulating the use of the GGC servers by (a) tightly restricting ISP's ability to relocate the servers, (b) limiting unauthorized access to the space used by Google's servers, and (c) forbidding the ISPs to access, use, or dispose of the GGC servers without Google's permission; (2) provision of a connection to the ISP's customers and the public internet; and (3) installation by ISPs, the Federal Circuit did not find an agency relationship. Dkt. No. 26 at 14–15.

Defendant argues that "to the extent there are any differences between the relevant venue facts in *Google* and the venue allegations here, the allegations are baseless and unsupported by the documents [Plaintiff] cites. For example, [Plaintiff] alleges that Netflix installs the OCAs, but nothing [Plaintiff] cites in its Complaint supports such an allegation." Dkt. No. 26 at 16. Defendant then proceeds to argue that there are differences in the contracts, and the contracts give Defendant less control than Google had. *Id.*

"[M]aintenance activities cannot, standing alone, be considered the conduct of Google's business"—which is "providing video and advertising services to residents of the Eastern District of Texas through the Internet." *In re Google LLC*, 949 F.3d at 1340, 1346. Instead, "[m]aintaining equipment is meaningfully different from—as only ancillary to—the actual producing, storing, and furnishing to customers of what the business offers." *Id.* at 1346.

Plaintiffs respond that *In re Google* does not support Defendant's argument. Dkt. No. 51 at 16. Plaintiffs argue that the Federal Circuit held that "Google lacked a 'regular and established place of business' within the district since it has no employee or agent regularly conducting its business at its alleged 'place of business' within the district." *Id.* (quoting *In re Google LLC*, 949 F.3d at 1347). Plaintiffs contend that *In re Google* did not hold that ISPs may never be agents for venue purposes under 28 U.S.C. § 1400(b), but rather that "under the facts of that case, ISPs that simply installed and performed routine maintenance on Google's servers were not acting as Google's agents in the conduct of Google's business." *Id.*

The Federal Circuit in *In re Google* found that although the ISP provided the GGC servers with network access, "Google has no right of interim control over the ISP's provision of network access beyond requiring that the ISP maintain network access to the GGC servers and allow the GGC servers to use certain ports for inbound and outbound network traffic." *In re Google LLC*,

14

949 F.3d at 1345. The Federal Circuit explained, "the ISP performs installation of the GGC servers. The contracts with the ISPs stated that the ISP was responsible for the installation . . ." but that "[a]lthough these provisions may be suggestive of an agency relationship . . . . [t]he installation activity does not constitute the conduct of a "regular and established" business, since it is a one-time event for each server." *Id.* at 1346. The Federal Circuit continued: "the contracts provide that 'Google may from time to time request that [the ISP] perform certain services' involving 'basic maintenance activities' . . ." and "[a]lthough the maintenance provision, like the provision on installation, may be suggestive of an agency relationship . . . . the maintenance activities cannot, alone, be considered the conduct of Google's business." *Id.* "Maintaining equipment is meaningfully different from—as only ancillary to—the actual producing, storing, and furnishing to customers of what the business offers." *Id.* The Federal Circuit stated this in the context of a contract which provided examples of "basic maintenance activities" as follows:

> physical switching of a toggle switch; power cycling equipment ... ; remote visual observations and/or verbal reports to Google on its specific collocation [sic] cabinet(s) for environment status, display lights, or terminal display information; labeling and dress-up of cabling within cabinet; tightening screws, cable ties, or securing cabling to mechanical connections, plug[s]; replacing existing plug-in only hardware such as circuit cards with spares or upgrades.

*In re Google*, 949 F.3d at 1346 (quoting *In re Google LLC* Exhibit B at 5).

Plaintiffs argue that the facts here are different as Netflix "maintains significant control over both the installation and continued operation of the OCAs," asserting that "the ISPs do much more than simply install and perform routine maintenance on Netflix's OCA servers. They work closely together as partners with Netflix to conduct Netflix's business of streaming video content to subscribers in this District." Dkt. No. 51 at 17. Plaintiffs assert that Netflix explains it is "important to be able to work with those ISPs in a direct and collaborative way." *Id.* (quoting Dkt.

15

No. 51-1). Plaintiffs contend the collaborative nature of Netflix's relationship with the ISPs is aptly described in the Open Connect Deployment Guide, which refers to the ISPs as Netflix's "partners" no less than forty-eight times and repeatedly states they "work closely" with Netflix. *Id.* at 17–18 (citing Dkt. No. 51-2 at 2 ("This article summarizes what partners can expect during the deployment process for embedded OCAs."), 7 ("Your team members will work closely with the corresponding members of the Netflix team to facilitate the overall process.")).

Plaintiffs contend that unlike the "one-time event[s]" that "do[] not constitute the conduct of a 'regular and established' business" in *In re Google*, Defendant's ISP partners help Defendant operate the OCAs and control how they deliver content to Netflix's subscribers. *Id.* at 18 (quoting *In re Google LLC*, 949 F.3d at 1346). Plaintiffs cite the Open Connect Deployment Guide, which explains: "the manner in which traffic is directed to the appliance is determined explicitly by you [the ISP] and Netflix, not by the appliance itself" and "OCA only serves clients at IP addresses that you advertise to the OCA via a BGP session. In other words, traffic is only delivered from your embedded OCAs to the customer prefixes that you explicitly announce to them." *Id.* (citing Dkt. No. 51-2).

Plaintiffs also assert that, unlike *In re Google*, Defendant requires ISPs to have several personnel available to carry out tasks that Defendant may assign, including "a 24/7 contact who can escalate critical issues in a timely fashion." *Id.* (quoting Dkt. No. 51-2 at 13). Plaintiffs further cite to the Open Connect Deployment Guide which requires ISP partners to "identify a person or a set of people who are available to perform" specific roles for Defendant at the ISP to "facilitate the overall process" of delivering streaming video to Netflix customers." *Id.* (quoting Dkt. No. 51-4 at 1). Plaintiffs include, in their response, the following table from the Open Connect Deployment Guide:

16

## TEAM ROLES

To participate in the OCA program, you will need to identify a person or a set of people who are available to perform the following roles. Your team members will work closely with the corresponding members of the Netflix team to facilitate the overall process.

| Partner Role | Description | Corresponding Netflix role(s) |
|---|---|---|
| Engagement Manager | The main point of contact for the Netflix Open Connect Partner Engagement Manager (PEM) | Netflix Open Connect PEM |
| Legal Representative | Reviews and accepts the legal agreements that are required for OCA deployments | PEM, Open Connect Legal, Open Connect Business Operations |
| Network Engineer | Provides information about partner sites, OCA configurations, maintenance, and network routing | PEM, Open Connect Operations |
| Logistics Representative | Directs the shipment of OCAs<br><br>Your logistics representative should be involved at the beginning of the engagement process to avoid shipping delays at later stages of the process | PEM, Open Connect Logistics, Open Connect Operations |
| Data Center Operations | Installs OCAs on the partner network | Open Connect Operations |
| Network Operations | Works with Netflix to troubleshoot routing and other configuration issues that might arise | Open Connect Network Engineering, Open Connect Operations |

*Id.* at 19; Dkt. No. 51-2 at 8. This table indicates that it is required for an ISP to identify a person

or set of people available to perform these roles to participate in the OCA program and that "[y]our

team members will work closely with the corresponding members of the Netflix team to facilitate

the overall process." *Id.*

17

Defendant replies that these facts merely mirror *In re Google*. Dkt. No. 57 at 4. Defendant argues "[t]hese are the same conditions and activities that the Federal Circuit already found insufficient to establish that an ISP was an agent of a defendant." *Id.* at 5.

In fact, the Federal Circuit distinguished the "basic maintenance activities" laid out in contracts in *In re Google* from other activities: "[m]aintaining equipment is meaningfully different from—as only ancillary to—the actual producing, storing, and furnishing to customers of what the business offers." *In re Google LLC*, 949 F.3d at 1346. Plaintiffs argue that Defendant's deposition confirms that Defendant's ISP partners work closely with Netflix to both store and furnish to customers Netflix content. Dkt. No. 51 at 19–20 (citing Dkt. No. 51-10 at 96:9–11 ("Q What is Netflix's definition of an OCA? A An Open Connect appliance is a piece of hardware that **stores and delivers** Netflix content.") (emphasis added)).

Upon examination of the "Team Roles" table from the Open Connect Deployment Guide, some of the required activities are the sort of basic maintenance activities addressed in *In re Google*. The Logistics Representative and Data Center Operations roles perform tasks related to the sort of one-time installation event described in *In re Google*. *See* Dkt. No. 51-2 at 8. Further, the Network Engineer performs maintenance as described in *In re Google*. *See Id.*

However, the Network Engineer also "provides information about partner sites, OCA configurations . . . and network routing." *Id.* The Legal Representative performs work that is not necessary for operation of the OCAs, but rather is a requirement by Defendant that ISPs must meet to use the OCAs at all. *Id.* Most notably, the Engagement Manager and Network Operations are "[t]he main point of contact for the Netflix Open Connect Partner Engagement Manager (PEM)" and "[w]orks with Netflix to troubleshoot routing and other configuration issues that might arise." *Id.*

Troubleshooting goes above and beyond mere maintenance. The Network Operations role does not merely conduct "physical switching of a toggle switch; power cycling equipment . . . ; remote visual observations . . . ; labeling . . . ; tightening screws, cable ties, or securing cabling to mechanical connections, plug[s]; replacing existing plug-in only hardware . . ." as discussed in *In re Google*, but rather "[w]orks with Netflix to troubleshoot." *See In re Google LLC*, 949 F.3d at 1346; *see also* Dkt. No. 51-2 at 8.

Finally, basic maintenance activities do not foreclose agency, but rather "standing alone" are not considered the conduct of Defendant's business. *See In re Google LLC*, 949 F.3d at 1346. Rather, "the maintenance provision, like the provision on installation, may be suggestive of an agency relationship . . . ." *Id.* Here, the maintenance and installation roles do not stand alone, but rather alongside a troubleshooter, a legal representative, and human communications to "work closely with the corresponding members of the Netflix team" "in a direct and collaborative way" so that Defendant can "constantly measure and analyze performance and augment capacity as requirements evolve" for OCAs to "store[] and deliver[] Netflix content" *See* Dkt. No. 51-2 at 8; Dkt. No. 51-1; Dkt. No. 51-1 at 3; Dkt. No. 51-10 at 96:9–11 (emphasis added). Examined in its totality, the Court finds it clear that the ISPs are acting as Defendant's agents, and accordingly, recommends that venue in the above-captioned matter is proper and Defendant's Motion should be denied with respect to the improper venue argument.

### D. Transfer

Defendant's Motion also argues that the above-captioned matter should be transferred to the Northern District of California because of a "stark contrast in relevance, convenience, and fairness" between the Northern District of California and this District. Dkt. No. 26 at 18 (quoting

*In re Nintendo Co., Ltd.*, 589 F.3d 1194, 1198 (Fed. Cir. 2009)). There is no dispute that this case could have been brought in the Northern District of California. Dkt. No. 51 at 20.

Accordingly, the question is whether the "public and private factors relating to the convenience of parties and witnesses as well as the interests of particular venues" demonstrate that N.D. Cal. is clearly more convenient than this District. *See Good Kaisha IP Bridge 1 v. Broadcom Ltd.*, No. 2:16-cv-00134-JRG-RSP, 2017 WL 750290, at *1 (E.D. Tex. Feb. 27, 2017). It is the Defendant's burden to prove that the transferee venue is "clearly more convenient" than the transferor venue. *In re Volkswagen of America, Inc.*, 545 F.3d at 315 ("[W]hen the transferee venue is not clearly more convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected. When the movant demonstrates that the transferee venue is clearly more convenient, however, it has shown good cause and the district court should therefore grant the transfer.")

The private-interest factors include "(1) the relative ease of access to sources of proof, (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.* The public-interest factors include: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws." *Id.*

## 1. Relative Ease of Access to Sources of Proof

"In patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer. Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that location." *Deep Green Wireless LLC v. Ooma, Inc.*, 2017 WL 679643, at *2 (citing *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009)) (quotations omitted).

Defendant argues that "all of the documentary evidence that might be relevant to the accused products is in the Northern District of California." Dkt. No. 26 at 24 (citing Dkt. No. 26-13 at ¶ 6–7). Defendant asserts that, to the extent it becomes relevant, Defendant's financial information is in the Los Gatos office and Defendant does not maintain any documentation in this District. *Id.* at 24–25 (citing Dkt. No. 26-13 at ¶ 6–7). Defendant also contends that Docker, Inc., a third-party company headquartered in the Northern District of California, may have potentially relevant evidence as it is the company that provides the open-source code for the software containers on which Defendant's streaming service relies. *Id.* at 25. Finally, Defendant asserts that Plaintiffs' presence in the Northern District of California, as subsidiaries of Broadcom, Inc., which is headquartered in San Jose, significantly outweigh its presence in the Eastern District of Texas. *Id.*

Plaintiffs respond that a "movant 'is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim.'" Dkt. No. 51 at 20 (quoting *Hammers v. Mayea-Chang*, No. 2:19-cv-00181-JRG, 2019 WL 6728446, at *5 (E.D. Tex. Dec. 11, 2019) (citation omitted)). Further, "venue analysis is concerned only with the presentation of evidence at and during trial." *Seven Networks, LLC*, 2018 WL 4026760, at *3 n.4; *see also AGIS Software Dev. LLC v. Huawei Device USA Inc.*, No. 2:17-cv-00513-JRG, 2018 WL 2329752, at *3 (E.D. Tex. May 23, 2018) ("[T]he inquiry regarding access to sources of proof correlates to production and presentation to the jury at trial.").

Plaintiffs argue that Defendant has cited to no specific evidence in that district, "much less specific evidence that it expects to use at trial." *Id.* at 21. Plaintiffs contend that merely stating that unidentified documents that "might be relevant" are allegedly maintained in the Northern District of California does not support transfer. *Id.* (citing *Invitrogen Corp. v. Gen. Elec. Co.*, No. 6:08-cv-

21

00113, 2009 WL 331889, at *3 (E.D. Tex. Feb. 9, 2009)).  As stated in *Invitrogen Corp.*, "other than generally referring to documents, they have not identified any specific evidence, physical or otherwise. These general statements fail to show that transfer would make access to sources of proof either more or less convenient for the parties." *Invitrogen Corp.*, 2009 WL 331889, at *3.

With regards to third-party Docker, Plaintiffs point out that the issue is not whether Docker might have potentially relevant evidence but whether it has specific evidence that will likely be needed at trial, which Defendant has not identified. Dkt. No. 51 at 21. Plaintiffs respond that although Defendant generally refers to "open source code," open-source code is, by definition, available to anyone, anywhere. *Id.* Further, during the deposition about the relevance of Docker to this case, Defendant's corporate representative refused to answer based on privilege:

> Q. And do you – what relevance does Docker have to this case? MS. HASSELBERG: Objection, form. MR. JACOB: Instruct not to answer except for communications you know through communications other than your attorneys. A. I can't answer.

*Id.* at 21–22 (quoting Dkt. No. 51-10 at 63:24–64:5).  Defendant should not be allowed to rely on evidence that it has shielded from discovery based on privilege.

Plaintiffs point to specific evidence that they assert is relevant to this matter. *Id.* at 22–24. Plaintiffs cite to contracts with at least six ISP partners in this District that store and deliver Netflix content to Netflix subscribers within the District and Defendant's agreements with Amazon Web Services. *Id.* Plaintiffs argue that the ISP partners have "information documenting the amount of content that Netflix streams to subscribers through its OCAs in this District, which is relevant to determining both the extent and the value of Netflix's infringing activity." *Id.* at 22 (citing Dkt. No. 51-14). Plaintiffs further argue that Amazon Web Services documents are relevant because much of the accused functionality is implemented on hardware and services provided by AWS

under its agreements with Defendant, including the Netflix Titus system and alleged infringement of U.S. Patent Nos. 9,402,098 and 10,911,938. *Id.* at 23–24 (citing Dkt. No. 51-35).

Plaintiffs also argue that Defendant provides OCAs at Internet Exchange Points (IXPs) that indirectly connect to ISP servers to receive data. Dkt. No. 51 at 23. Plaintiffs assert there are three IXPs in Texas: Equinix, Inc. and Midsouth U.S. Internet Exchange, Inc. a/k/a MUS-IX in Dallas, and CyrusOne Internet Exchange in Houston. Plaintiffs show that these IXPs have "relevant information documenting the amount of content that Netflix streams to subscribers in this District," but does not identify more specific evidence. *Id.*

Defendant replies reiterating that the bulk of relevant evidence in a patent case comes from the accused infringer, and as Defendant asserts all source code and other documentation is located in Los Gatos, "regardless of what evidence will be at issue in this case, it will be collected from Los Gatos." Dkt. No. 57 at 10 (citing *Lifetstyle Sols., Inc. v. Abbyson living LLC*, 2017 WL 525006, at *3 (E.D. Tex. Nov. 10, 2017)). The Court finds that a blanket argument that most relevant evidence will come from an accused infringer and that allegedly all documentation of the accused infringer is in another district is insufficient to meet the requirement that Defendant identify relevant evidence in the transferee district in the face of Plaintiffs' showing regarding relevant evidence in the transferor district.

Defendant has failed to identify any specific evidence in the record and articulate the precise way that evidence supports its claim. Plaintiff, however, has done so in identifying the agreements between Defendant and at least six ISP partners in this district as well as the agreements between Defendant and Amazon Web Services. Accordingly, the Court finds this factor weighs somewhat against transfer.

## 2.   Availability of Compulsory Process

Defendant has identified thirteen third-party witnesses: six prosecuting attorneys, four alleged prior-art inventors, and three former employees in the Northern District of California. Dkt. No. 21–23. Further, Defendant argues that "to the extent Netflix is required to compel testimony from employees of Docker, Inc. … . Docker is headquartered in the Northern District of California." *Id.* at 23.

Plaintiffs respond that "for the Court to meaningfully assess the weight that should be attached to a third-party witness, it is incumbent upon the advancing party to demonstrate the likelihood of that witness actually testifying at trial." Dkt. No. 51 at 25 (quoting *Realtime Data LLC v. Dropbox, Inc.*, No. 6:15-cv-00465-RWS-JDL, 2016 WL 153860, at *7 (E.D. Tex. Jan. 12, 2016)). Plaintiffs argue that Defendant has not contended that the thirteen third-party witnesses will be likely to be called to testify at trial and counters that the information most of them allegedly have is not relevant to any issue in this case because Defendant filed a declaratory-judgment action against CA in the Northern District of California seeking a non-infringement judgment, but not invalidity. *Id.* at 25–26 (citing *Netflix, Inc.*, Dkt. No. 1 (N.D. Cal. May 14, 2021)).

The Court disagrees with the logical jump that Plaintiffs attempt: that failing to seek invalidity in another action means Defendant does not consider that issue relevant in this separate action.  However, Defendant has here failed to specifically allege why their testimony is important or provide any information regarding the likelihood that their knowledge is material to the issues that will be tried. *See Alacritech Inc. v. CenturyLink, Inc.*, No. 2:16-cv-00693-JRG-RSP, 2017 WL 4155236, at *5 (E.D. Tex. Sept. 19, 2017) ("The Court discounts these prior-art witnesses because Defendants have failed to specifically allege why their testimony is important."); *Kranos IP Corp. v. Riddell, Inc.*, No. 2:17-cv-00443-JRG, 2017 WL 3704762, at *12 (E.D. Tex. Aug. 28, 2017)

24

("Without further information with respect to the likelihood that any of these prosecuting attorneys should testify, the Court does not give weight to these arguments.").

Plaintiffs identify specific third-party witnesses who live in or near this District and allege why their testimony is important. Dkt. No. 51 at 27–28. First, Plaintiffs argue that specific ISP personnel Derek Davidson, Matt Tucker, Clint Cook, and Matt LaRoy have technical information about establishing and maintaining the peering connections between the ISP-based OCAs and OCAs at Netflix's IXP locations used for content-fill operations accused of infringement. *Id.* at 27. Second, Plaintiffs argue that Byron Hicks and Peter Macmillan, based in Dallas, have relevant information concerning peering connections used for the accused content-fill operations between IXP-located OCAs and OCAs at Netflix's ISP partners. *Id.* Plaintiffs also identify Karen Stoker, who is referenced in Defendant's agreements with CyrusOne as the "Subject Matter Expert." *Id.* Third, Plaintiffs identify Sean Shriver, an AWS employee in Dallas, as a NoSQL Solutions Architect and a leading expert on the AWS DynamoDB database.  This is relevant because Defendant uses the DynamoDB to support its A/B testing process to evaluate and update its "adaptive streaming and content delivery network algorithms" and CA has accused Netflix's A/B testing process of infringement. *Id.* at 27–28 (citing Dkt. No. 51-19). Plaintiffs show that each of these witnesses, including those who reside just outside of this District, is subject to the Court's subpoena power and could be called to trial. *Id.* at 28.

Defendant replies that Plaintiffs "try to minimize" the relevance of Defendant's identified third party witnesses "and manufacture their own." Dkt. No. 57 at 9. Defendant argues that the potential third-party witnesses include Defendant's former employees who authored articles cited in Plaintiffs' Complaint, attorneys who prosecuted the asserted patents, and prior art inventors, and that "[t]hese witnesses clearly have information relevant to the allegations of the Complaint,

invalidity, and prosecution of the asserted patents."  While it is certainly not dispositive of their relevance, the Court has observed across scores of patent jury trials that prosecuting attorneys almost never testify, partly due to privilege issues but mainly because they have little relevant knowledge not more easily obtained from other sources.  As for the named inventors, Plaintiffs cast serious doubt on Defendant's representation that four of them actually reside in N.D. Cal. Dkt. No. 51 at 31-32.

Simply stating that these witnesses "clearly have information relevant" does not meet Defendant's burden to specifically allege how their testimony is important. Here, as with the ease of access to sources of proof factor, Plaintiffs have identified specific third-party witnesses and specifically shown why the testimony is important. Defendant has identified specific third-party witnesses but has not shown how their testimony is important. This factor weighs slightly against transfer.

### 3.  Cost of Attendance for Willing Witnesses

This factor is intended to be a separate factor but the arguments in this case tend to conflate this factor with the last one. "The convenience of the witnesses is probably the single most important factor in a transfer analysis." *Deep Green*, 2017 WL 679643, at *4 (quoting *In re Genentech, Inc.*, 566 F.3d 1338 at 1342). The location of third-party witnesses "weighs heavily for transfer." *Good Kaisha v. Xilinix, Inc.*, 2017 WL 4076052, at *4 (citing In re Apple, Inc., 581 F. App'x 886, 889 (Fed. Cir. 2014)). Defendant identifies twenty-one employees with potentially relevant information based on Plaintiffs' Complaint; Renee Rodriguez, Netflix's Vice President; four of the twelve inventors of the asserted patents; and thirteen third-party witnesses, all in the Northern District of California. Dkt. No. 26 at 19–21.

Plaintiffs argue that there is no reason for Defendant to assume the alleged prior-art and patent-prosecution witnesses would be willing witnesses under this factor, and that Netflix cannot "double-dip" by counting those individuals under both factors. Dkt. No. 51 at 29 (citing *AGIS Software Dev. LLC*, 2018 WL 2329752, at *3 ("It is common to see parties attempt to have this Court double- or triple-count witnesses for purposes of evaluating the convenience of a forum … These factors do not permit a single source of proof or witness to be 'double counted' or unduly influence the analysis.")).

Plaintiffs contend that as to Defendant's employees, "it is the convenience of non-party witnesses, rather than of party witnesses, that is more important and accorded greater weight in a transfer of venue analysis." *Id.* (quoting *Frito-Lay N. Am., Inc. v. Medallion Foods, Inc.*, 867 F. Supp. 2d 859, 870–71 (E.D. Tex. 2012) (citation omitted)). Plaintiffs point out that Netflix does not state that it will likely call any of them at trial but simply says that they have "potentially relevant information." *Id.* (quoting Dkt. No. 26 at 19–20).

Plaintiffs further show that Defendant has "numerous engineers and other employees in Texas and in the Eastern District of Texas with relevant knowledge about the accused Netflix systems and services" that Defendant's Motion fails to mention, and that courts have cautioned against this kind of venue-fact shading, noting that a party "cannot simply 'cherry-pick' witnesses to present one venue as more convenient than another." Dkt. No. 51 at 30 (quoting *CloudofChange, LLC v. NCR Corp.*, No. 6:19-cv-513, 2020 WL 6439178, at *4 (W.D. Tex. Mar. 17, 2020)). Plaintiffs then name seven of Defendants' employees living in this District "who appear to have relevant information . . . ." *Id.*

More specifically, Plaintiffs argue that Brady Walsh is "an Austin-based specialist focusing on Netflix's accused Open Connect CDN" and that "Mr. Walsh appears to be one of the Netflix

employees most knowledgeable about the accused Open Connect network. Netflix's own presentation materials identify him as the first of five 'OpenConnect Contact[s].'" *Id.* at 30–31. Plaintiffs also argue that Steve Urban, a Netflix Remote Engineering Leader based in Austin, is Netflix's leading expert on A/B testing, and that because Netflix uses A/B testing as part of its infringement, Mr. Urban has knowledge of relevant information and is a likely witness. *Id.* at 31. Plaintiffs then name several other Texas-based Netflix employees.

Defendant replies that Defendant does not have to show that every witness identified in its motion is likely to testify at trial, as "The court should consider all potential material and relevant witnesses, regardless of the likelihood of their being called to testify at trial." Dkt. No. 57 at 7 (quoting *Godo Kaisha IP Bridge 1 v. Xilinx, Inc.*, 2017 WL 4076052, at \*4 (E.D. Tex. Sept. 14, 2017) (citing *In re Genentech, Inc.*, 566 F.3d 1338 at 1343 ("Requiring a defendant to show that the potential witness has more than relevant and material information at this point in the litigation or risk facing denial of transfer on that basis is unnecessary.")). Defendant is correct that the Court should consider all potential material and relevant witnesses, even without a showing of the likelihood of being called to testify at trial. But that does not contradict or change that a "movant 'is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim.'" *Hammers*, 2019 WL 6728446, at \*5. For the Court to meaningfully evaluate the relative convenience of different places of trial, the Court must understand whether a potential witness has knowledge that is material to the issues that will be disputed at the trial.

The Court considers the witnesses that Defendant points to for this factor. More importantly and accorded greater weight than party employees "is the convenience of non-party witnesses." *Frito-Lay N. Am., Inc.*, 867 F. Supp. 2d at 870–71. Defendant has identified thirteen

third-party witnesses. Dkt. No. 26 at 20–21. Plaintiffs have identified eight and have specifically shown why these witnesses are likely to testify at trial. Dkt. No. 51 at 27–28. These thirteen and eight were both identified in the previous factor and should not be double counted. *See AGIS Software Dev. LLC*, 2018 WL 2329752, at *3. Both parties name several of Defendants' employees in both the Northern District of California and the Eastern District of Texas. Considering all of the foregoing, the Court finds that this factor is neutral.

### 4. Practical Problems

"Practical problems include those that are rationally based on judicial economy. Particularly the existence of duplicative suits involving the same or similar issues may create practical difficulties that will weigh heavily in favor of transfer." *Uniloc USA, Inc. v. Apple Inc.*, 2017 WL 11553227, at *9 (E.D. Tex. Dec. 22, 2017); *see also J2 Glob. Commc'ns, Inc. v. Protus IP Sols., Inc.*, 2008 WL 5378010, at *5 (E.D. Tex. Dec. 23, 2008). Defendant argues that judicial economy favors transfer because there is another case pending in the Northern District of California involving related plaintiffs, the same defendant, and the same accused products. Dkt. No. 26 at 26–27 (citing "Case No. 8:20-cv-00529").

Plaintiffs argue that Defendant's argument regarding the case pending in the Northern District of California is faulty because "[t]hat case however, involves different plaintiffs, different patents, different claims and claim terms, different prior art, different infringement contentions, and different accused technology. 'Put simply, the two cases will be decided on entirely different evidence and different legal theories.'" Dkt. No. 51 at 33 (quoting *Allergan Sales*, 2016 WL 8201783, at *2). Plaintiffs further argue that Judge Donato agrees because after Defendant filed its declaratory judgment action against Plaintiffs in the Northern District of California for the patents asserted here and moved to consolidate that case with the aforementioned action pending

29

before Judge Donato, Judge Donato rejected Defendant's argument that the cases were related and denied Defendant's Motion. *Id.* (citing *Broadcom Corp. v. Netflix, Inc.*, No. 3:20-cv-4677–JD, Dkt. No. 125 (N.D. Cal. June 8, 2021)).

Defendant replies that there are now two pending cases in the Northern District of California that involve overlapping parties and technology, and accordingly this factor "weighs at least slightly in favor of transfer." Dkt. No. 57 at 11. Although Judge Donato has already found those two cases are not sufficiently related to warrant case consolidation, no such finding has been made with respect to the present case and each of the two cases pending in the Northern District of California. *See Broadcom Corp. v. Netflix, Inc.*, No. 3:20-cv-4677–JD, Dkt. No. 125 (N.D. Cal. June 8, 2021). Plaintiffs admit one of those cases is a declaratory judgment action against Plaintiffs for the patents asserted here. Dkt. No. 51 at 33 (citing *Broadcom Corp. v. Netflix, Inc.*, No. 3:20-cv-4677-JD, Dkt. No. 125 (N.D. Cal. June 8, 2021)). Minimal judicial economy may be created by transfer with respect to the commonality of patents and noninfringement argument.

However, Plaintiffs also argue that "the two cases will be decided on entirely different evidence and different legal theories." Dkt. No. 51 at 33 (quoting *Allergan Sales*, 2016 WL 8201783, at *2). For example, as discussed in other factors, Defendant has pointed to prior art witnesses and prosecuting attorneys as part of its convenience transfer motion. Such witnesses regard the invalidity defense, which Plaintiffs assert Defendant did not seek judgment on in its declaratory judgment action. Dkt. No. 51 at 25–26. Defendant does not challenge this assertion. Accordingly, if transfer were granted, either the declaratory judgment action would need to be expanded to include new legal issues that are not being litigated, or the cases would not be consolidated and any efficiency would be lost, replaced by the inefficiency of starting this matter over in a new district.  Furthermore, Defendant's filing of a declaratory judgment action months

after this action was filed, and just three days before its transfer motion, is the very type of procedural maneuvering that cannot influence a venue analysis.  Considering all facts, the Court finds this factor is neutral.

### 5.   Administrative Difficulties from Court Congestion

Defendant argues that the administrative difficulties flowing from court congestion are neutral because the difference in time to trial—17.7 months for the Eastern District of Texas and 22 months for the Northern District of California—is "negligible." Dkt. No. 26 at 28–29. Plaintiffs reply that Defendant admits that time to trial is shorter here than in the Northern District of California and that Defendant's argument that this factor is neutral is contrary to previous findings in this Court that the shorter time to trial weighs against transfer. Dkt. No. 51 at 34 (citing *Uniloc USA, Inc.*, 2017 WL 11553227 at *9 (holding this factor weighed against transfer because the "median time to trial in this District is several months faster than the Northern District of California")). Plaintiffs further argue that the unrelated case pending in Judge Donato's court was transferred to the Northern District on July 10, 2020, and "[n]ow, over a year later, the court has not even entered a scheduling order, no date has been set for a Markman hearing, and there is no trial date. Without question, this case will proceed more expeditiously here than in the Northern District." *Id.* (citing Dkt. Nos. 51-35; 51-34).

Defendant replies that this District's faster time to trial is "marginal" and that it "cannot outweigh all of the other factors." Dkt. No. 57 at 11 (citing *In re Genentech, Inc.*, 566 F.3d 1338 at 1347). Defendant is correct that, if "all the other factors" weighed against it, the court congestion factor alone would not outweigh all of them. However, the Court finds this factor itself weighs against transfer.

### 6.  Local Interest

Defendant argues that the Northern District of California has a greater interest in this dispute because Defendant and Plaintiffs' parent company are headquartered in that district, nearly half of the inventors and some of the patent prosecutors are located in that district, and the accused products are designed, developed, and managed in that district. Dkt. No. 26 at 28. Plaintiffs argue that Defendant acknowledges, however, that CA, Inc. maintains an office in this District. Dkt. No. 51 at 34.

Plaintiffs argue that over 3.16 million adults live in the Eastern District of Texas and 52% of United States adults had a Netflix subscription and it can be estimated that Defendant has more than 1.5 million subscribers in this District. Dkt. No. 51 at 35 (citing Dkt. Nos. 51-35; 51-36). Plaintiffs further argue that Netflix paid over $200 million in sales tax to the State of Texas from August 11, 2016, through August 11, 2020, and the scale of Netflix's business and allegedly infringing activities here give this Court a substantial interest in resolving the case. *Id.* at 35–36 (citing Dkt. No.51-15; *Network-1 Sec. Sols., Inc. v. D-Link Corp.*, 433 F. Supp. 2d 795, 801 (E.D. Tex. 2006)).

Plaintiffs further argue Defendant's analogy to national sales of an accused product is improper since "Netflix has taken specific actions to install its accused Open Connect CDN in this District . . . . [h]aving made the business decision to implement its accused Open Connect CDN in the Eastern District of Texas . . . Netflix cannot now disavow the local interests." *Id.* at 36–37 (citing Dkt. Nos. 51-10; 51-1).

Defendant replies that Plaintiffs' argument regarding a local interest based on Netflix subscribers has been squarely rejected by the Federal Circuit because "the fact that infringement is alleged here 'gives [this] venue no more of a local interest than the Northern District of

32

California or any other venue.'" Dkt. No. 57 at 11 (citing *In re Samsung Elecs. Co.*, 2021 WL 2672136, at *7 (Fed. Cir. June 30, 2021)). Defendant is correct that the infringement allegation gives this venue no more local interest than any other venue. "[T]he sale of an accused product offered nationwide does not give rise to a substantial interest in any single venue . . . ." *In re Hoffmann-La Roche Inc.*, 587 F.3d 1333, 1338 (Fed. Cir. 2009).

However, Plaintiffs' argument is not solely regarding infringement allegations. Rather, Plaintiffs argue that "Netflix is in the business of providing video content to subscribers here. Indeed, that business is significant." Dkt. No. 51 at 34–35. Plaintiffs' two arguments are plainly stated together: "[b]oth *the scale of Netflix's business* and its infringing activities here give this Court a substantial interest in resolving this case." *Id.* at 36 (citing *Network-1 Sec. Sols., Inc.*, 433 F. Supp. 2d at 801). Plaintiffs have properly argued a significant scale of business operations in the Eastern District of Texas.

The Court, in essence, weighs Defendant's argument that the Northern District of California has a greater interest because relevant parties are headquartered there, some witnesses are located there, and the accused products are designed, developed, and managed there against Plaintiffs' argument that significant business activities take place in the Eastern District of Texas. After due consideration, the Court finds these arguments nearly comparable in weight and finds this factor slightly favors transfer.

### 7. Familiarity of Forum with Governing Law

Defendant argues that both the Northern District of California and this District are equally "capable of applying patent law to infringement claims," and that this factor is therefore neutral. Dkt. No. 26 at 29 (quoting *Glob. Equity Mgmt. (SA) Pty. Ltd. v. Alibaba.com, Inc.*, 2017 WL

1109865, at *3 (E.D. Tex. Mar. 24, 2017)). Plaintiffs agree that this factor is neutral. Dkt. No. 51 at 37.

### 8.  Conflict of Laws

Defendant argues that there are no conflict of law issues implicated by transfer, and thus this factor is neutral. Dkt. No. 26 at 29. Plaintiffs agree that this factor is neutral.

## IV.   CONCLUSION

Most of the factors in the convenience transfer analysis either weigh against transfer or are neutral. Thus, Defendant has not met its burden to show that the Northern District of California is "clearly more convenient" than the Eastern District of Texas. *See In re Volkswagen of America, Inc.*, 545 F.3d at 315. Accordingly, Defendant's alternative request for a convenience transfer should also be denied.

It is accordingly recommended that Defendant's Motion (Dkt. No. 26) be **DENIED**.

A party's failure to file written objections to the findings, conclusions, and recommendations contained in this report within 14 days bars that party from *de novo* review by the District Judge of those findings, conclusions, and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. Fed. R. Civ. P. 72(b)(2); *see Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*). Any objection to this Report and Recommendation must be filed in ECF under the event "Objection to Report and Recommendations [cv, respoth]" or it may not be considered by the District Judge.

**SIGNED this 27th day of September, 2021.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

34