**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| CA, INC. and AVAGO TECHNOLOGIES INTERNATIONAL SALES PTE. LIMITED,<br><br>                Plaintiffs,<br><br>    v.<br><br>NETFLIX, INC.,<br><br>                Defendant. | No. 2:21-cv-00080-JRG-RSP<br><br>**PATENT CASE**<br><br><br>**JURY TRIAL DEMANDED** |

### DEFENDANT NETFLIX, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

1749556

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................................. 1

II.  ARGUMENT ...................................................................................................................... 1

    A.  '794 Patent .................................................................................................................. 1

        1.  Indefinite Terms .............................................................................................. 2

            a.  "minimiz[es/ing] (claims 1, 9) and "maximizing" (claim 9) .......... 3

            b.  "substantially" (claim 1) ................................................................. 7

        2.  "receiving a set of network objects in response to a first request to a server from a client" (claims 1, 9, 17) ...................................................... 9

            a.  The "receiving" step is performed "at the cache engine." ............ 10

            b.  Order of the steps ......................................................................... 12

    B.  '014 Patent ................................................................................................................ 14

        1.  "when processed" (claim 1) ......................................................................... 15

    C.  '419 Patent ................................................................................................................ 17

        1.  The disputed terms of the '419 patent are means-plus-function terms .............................................................................................................. 17

        2.  The disputed terms of the '419 patent are means-plus-function terms .............................................................................................................. 19

    D.  '098 Patent ................................................................................................................ 20

        1.  "transmission rate" (claims 1, 7) ................................................................. 20

        2.  "first time period" (claims 1, 7) / "second time period" (claim 1) .......... 22

    E.  '938 Patent ................................................................................................................ 25

    1.  "computing devices" (claims 1-14, 16-18, 20-30) ................................................. 25

            a.  Functional recitation ..................................................................... 25

            b.  Disclosure of corresponding structure .......................................... 28

    2.  "the login information received from the first computing device" (claims

5, 21) ................................................................................................................... 29

3.    "third system" ....................................................................................... 30

1749556

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Advanced Display Techs. v. AU Optronics Corp.*,
    No. 6:11-CV-011, 2012 WL 2872121 (E.D. Tex. July 12, 2012) .......................................4, 8

*Advanced Marketing Syst., LLC v. CVS Pharmacy, Inc.*,
    No. 15-cv-134-JRG-KNM, 2016 WL 1741396 (E.D. Tex. May 3, 2016) ............................26

*Amgen, Inc. v. Chugai Pharm. Co.*,
    927 F.2d 1200 (Fed. Cir. 1991)..............................................................................................8

*Cordis Corp. v. Boston Sci. Corp.*,
    561 F.3d 1319 (Fed. Cir. 2009)..............................................................................................21

*Core Wireless Licensing S.A.R.L. v. Apple Inc.*,
    No. 15-CV-05008-PSG, 2016 WL 3124614 (N.D. Cal. June 3, 2016) ..................................7

*Dow Chemical Co. v. Nova Chemicals Corp. (Canada)*,
    803 F.3d 620 (Fed. Cir. 2015).................................................................................................25

*Egenera Inc. v. Cisco Sys., Inc.*,
    972 F.3d 1367 (Fed. Cir. 2020).............................................................................................18

*Ericsson Inc. v. TCL Communication Technology Holdings, Ltd.*,
    161 F. Supp. 3d 438 (E.D. Tex. 2015).................................................................................20

*Geodynamics, Inc. v. Dynaenergetics US, Inc.*,
    No. 2:15-CV-1546-RSP, 2016 WL 6217181 (E.D. Tex. Oct. 25, 2016)..........................7, 23

*Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*,
    No. 4:20-CV-1749, 2021 WL 2711987 (S.D. Tex. July 1, 2021) ...........................................3

*Hitachi Maxell, Ltd. v. Top Victory Elecs. Co.*,
    143 F. Supp. 3d 485 (E.D. Tex. 2015)..............................................................................29, 30

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
    452 F.3d 1312 (Fed. Cir. 2006).............................................................................................16

*Hytera Communications v. Motorola Solutions, Inc.*,
    841 F. App'x 210 (Fed. Cir. 2021) .....................................................................................12, 13

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014)........................................................................................2, 3, 8

*IQASR LLC v. Wendt Corp.*,
    825 F. App'x 900 (Fed. Cir. 2020) ........................................................................6

*JobDiva, Inc. v. Monster Worldwide, Inc.*,
    No. 13-CV-8229 KBF, 2014 WL 5034674 (S.D.N.Y. Oct. 3, 2014) ........................4

*KLA-Tencor Corp. v. Xitronix Corp.*,
    No. A-08-CA-723-SS, 2011 WL 318123 (W.D. Tex. Jan. 31, 2011) ..................2, 7

*Liberty Ammunition, Inc. v. United States*,
    835 F.3d 1388 (Fed. Cir. 2016) ...........................................................................3

*MTD Prod. Inc. v. Iancu*,
    933 F.3d 1336 (Fed. Cir. 2019) .........................................................................19

*Nautilus, Inc. v. Biosig Instruments*, *Inc.*,
    572 U.S. 898 (2014) ...............................................................................2, 5, 22

*NobelBiz, Inc. v. Glob. Connect, LLC*,
    701 F. App'x 994 (Fed. Cir. 2017) .....................................................................17

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008) ....................................................................16, 17

*Pacing Techs., LLC v. Garmin Int'l*,
    778 F.3d 1021 (Fed. Cir. 2015) ....................................................................11, 16

*Personal Audio, LLC v. Apple, Inc.*,
    No. 09-cv-111, 2011 WL 11757163 (E.D. Tex. Jan. 31, 2011) .......................26, 27

*Personalized Media Commc'ns, LLC v. Google LLC*,
    No. 2:19-cv-00090-JRG, 2020 WL 1666462 (E.D. Tex. Apr. 3, 2020) .............29, 30

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ...............................................................10, 15, 20

*Pi-Net Int'l v. JP Morgan Chase*,
    No. 12-282-SLR, 2014 WL 1997039 (D. Del. May 14, 2014) ...............................26

*Pilot Energy Sols., L.L.C. v. OXY USA Inc.*,
    No. 16-CA-00687-SS, 2017 WL 3726432 (W.D. Tex. Aug. 25, 2017) ...................12

*Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*,
    989 F.3d 1002 (Fed. Cir. 2021) .........................................................................19

*RFID Tracker Ltd. v. Wal-Mart Stores Inc.*,
    545 F. Supp. 2d 571 (E.D. Tex. 2008) ................................................................22

1749556

*Sarif Biomed. LLC v. Brainlab, Inc.*,
    No. 13-846-LPS, 2015 WL 5072085 (D. Del. Aug. 26, 2015)..............................................27

*SCVNGR, Inc. v. DailyGobble, Inc.*,
    No. 6:15-CV-493-JRG-KNM, 2017 WL 4270200 (E.D. Tex. Sept. 26, 2017).....................12

*Secure Web Conf. Corp. v. Microsoft Corp.*,
    640 Fed. App'x. 910 (Fed. Cir. 2016)...................................................................................16

*Sentry Prot. Prod., Inc. v. Eagle Mfg. Co.*,
    400 F.3d 910 (Fed. Cir. 2005).................................................................................................11

*Soque Holdings Ltd. v. Keyscan, Inc.*,
    No. 09-2651 MHP, 2010 WL 2292316 (N.D. Cal. 2010) .....................................................26

*Southwall Techs., Inc. v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995).................................................................................................11

*SpeedTrack, Inc. v. Amazon.com*,
    998 F.3d 1373 (Fed. Cir. 2021).............................................................................................11

*St. Isidore Research, LLC v. Comercia Inc.*,
    No. 2:15-CV-1390-JRG-RSP, 2016 WL 4988246 (E.D. Tex. Sept. 19, 2016).....................18

*Strong v. B.P. Expl. & Prod., Inc.*,
    440 F.3d 665 (5th Cir. 2006) ..................................................................................................19

*Synchronoss Techs., Inc. v. Dropbox, Inc.*,
    987 F.3d 1358 (Fed. Cir. 2021).............................................................................................18

*Wi-Lan, Inc. v. Apple, Inc.*,
    811 F.3d 455 (Fed. Cir. 2016)................................................................................................12

*Widevine Techs., Inc. v. Verimatrix, Inc.*,
    No. 07-cv-321, 2009 WL 3734106 (E.D. Tex. Nov. 4, 2009)...............................................26

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015).................................................................... *passim*

**Statutes**

35 U.S.C. § 103............................................................................................................................21

35 U.S.C. § 112(e) ......................................................................................................................12

35 U.S.C. § 112, ¶ 6.................................................................................................17, 18, 25, 28

35 U.S.C. § 311(b) ......................................................................................................................29

v

PDA, [or]................................................................................................................28

**Other Authorities**

37 C.F.R. § 1.102...................................................................................................11

37 C.F.R. § 1.132.........................................................................................20, 21, 22

*ThyssenKrupp Elevator Ams. Corp*.........................................................................27

U.S. Patent No. 7,930,712.......................................................................................16

# EXHIBIT LIST

**Exhibit 1:**    Declaration of Dr. Mark E. Crovella Ph.D., Regarding the Construction of Certain Terms in U.S. Patent No. 7,103,798

**Exhibit 2:**    Declaration of Henry H. Houh, IPR2021-01219, July 30, 2021

**Exhibit 3:**    Declaration in Support of Accompanying Petition to Make Special Reason VIII – Special Procedure: Search Was Made, January 31, 2000

**Exhibit 4:**    Declaration of Dr. Michael J. Freedman Regarding the Construction of Certain Terms in U.S. Patent No. 8,656,419

**Exhibit 5:**    Declaration under 37 C.F.R. § 1.132, Alexander Macinnis ['098 File History]

**Exhibit 6:**    Response to 10/08/15 Final Office Action ['098 File History]

**Exhibit 7:**    Final Rejection ['098 File History]

**Exhibit 8:**    Notice of Allowance ['098 File History]

**Exhibit 9:**    Declaration of Dr. Konstantinos Psounis, Ph.D. re Claim Construction for U.S. Patent No. 10,911,938

**Exhibit 10:**    9/17/2021 Letter from Richard Wynne to Sharif Jacob

**Exhibit 11:**    Declaration of Stephen Gray, IPR2021-01334

**Exhibit 12:**    Remarks/Arguments ['938 File History]

**Exhibit 13:**    U.S. Patent No. 7,930,712

I. **INTRODUCTION**

Defendant Netflix, Inc. submits this responsive claim construction brief.  Plaintiff largely delegates the task of claim construction to the jury, failing to construe disputed terms so as to sweep in subject matter that has not been claimed.  Netflix, on the other hand, proposes constructions consistent with the plain and ordinary meaning, intrinsic record, and applicant's own definitions.  Where the intrinsic record provides no boundaries to a person of ordinary skill in the art, Netflix respectfully requests that the Court hold the disputed terms indefinite.

II. **ARGUMENT**

A. **'794 Patent**

The claims of the '794 patent, entitled "Network Object Cache Engine," are directed to methods for maintaining network objects at a cache engine that include at least the steps of:

> receiving a set of network objects in response to a first request to a server from a client; and
>
> maintaining said network objects in a cache memory in a cache engine, said cache engine connected via a network to the server and the client, said cache memory including mass storage.

As Plaintiffs concede, the concept of caching previously requested information was hardly novel at the time of the patent's filing.  Plf. Br. at 2-3.  The specification admits that a "known method" for reducing network congestion was the use of a proxy cache that "receiv[es] requests for information from one or more clients, obtain[s] that information from one or more servers, and transmit[s] that information to the clients in place of the servers."  '794 patent at 1:26-32.  After obtaining the information in response to an initial request, the proxy cache can deliver the same information in response to subsequent requests "without having to repeat the request to the server," reducing both load on the server and traffic in the network.  *Id.* at 1:26-35.

Thus, the problem purportedly addressed was not a *lack of* a way to cache previously requested objects, but rather that existing methods (e.g., proxy caches) allegedly "ha[d] the

1

drawback that significant overhead is required by the local operating system and the local file system or file server of the proxy." *Id.* at 1:35-39.  As a result, the alleged point of novelty is in *how* those network objects are maintained on "mass storage." *See, e.g.*:

> wherein said step of maintaining includes steps of recording said network objects in said cache memory and retrieving said network objects from said cache memory, so as to *substantially minimizes a time required for retrieving said network objects from said mass storage*.  ['794 patent, cl. 1 (emphasis added)]

### 1.      Indefinite Terms

No objective standards exist for determining: (i) whether retrieval times from mass storage have been "minimiz[ed]" (either "substantially" as in claim 1, or standing alone as in claim 9); or (ii) whether rates for writing, erasing, or retrieving data to/from mass storage have been "maximiz[ed]" (claim 9).  Because claims 1 and 9, "read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention," they are invalid for indefiniteness.  *Nautilus, Inc. v. Biosig Instruments*, *Inc.*, 572 U.S. 898, 901 (2014).

Under the governing *Nautilus* standard, it is not enough that "a court can ascribe *some* meaning to a patent's claims." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370–71 (Fed. Cir. 2014) (quoting *Nautilus*, 572 U.S. at 911).  Instead, "[t]he claims, . . . must provide objective boundaries for those of skill in the art." *Id.* at 1371. "[W]hen there is no objective standard by which to determine the scope of the word of degree, the word of degree renders the claims indefinite." *KLA-Tencor Corp. v. Xitronix Corp.*, No. A-08-CA-723-SS, 2011 WL 318123, at *3 (W.D. Tex. Jan. 31, 2011).  Here, the claim language and specification are devoid of an objective standard for measuring "minimiz[es/ing]," "maximizing," and "substantially" in claims 1 and 9.  Nor were any objective standards otherwise known to a POSITA. *See* Exh. 1 ("Crovella Decl.") ¶¶ 32-85.

Unable to establish any objective boundaries for these terms, Plaintiffs offer two distractions.  One is to propose previously undisclosed constructions for "minimiz[es/ing]" and "maximizing."  *E.g.*, Plf. Br. at 7 ("'Minimize' means 'reduce'").  Plaintiffs did not even **_identify_** these terms for construction, much less disclose construing them as "reduce" and "increase."  Doing so now flouts the Court's DCO and the Local Patent Rules.  *See* Dkt. No. 74; L.P.R. 4-1(a), 4-2(a), 4-3(a).  In any event, Plaintiffs' untimely constructions fail to provide any objective baseline or standard for measuring whether or not "minimiz[es/ing]" or "maximizing" has been achieved.  The second distraction is to tender examples of "substantially," "minimiz[es/ing]," and "maximizing" that purportedly are within the scope of the claims.  But these examples no more resolve indefiniteness than declaring that Kansas is within the United States resolves where the U.S.-Canada boundary lies.  *See Interval Licensing*, 766 F.3d at 1370–71.

a.      **"minimiz[es/ing] (claims 1, 9) and "maximizing" (claim 9)**

The terms "minimiz[es/ing]," which modifies "a time required for retrieving said network objects from said mass storage" in claims 1 and 9, and "maximizing," which modifies various "rate[s]" for writing, retrieving, and erasing in claim 9, render these claims indefinite because a POSITA would have been unable to discern any objective standards for deciding, with reasonable certainty, whether "a time required for retrieving" has been "minimiz[ed]," or whether the recited "rate[s]" have been "maximiz[ed]."  Crovella Decl. ¶¶ 47-85.  Plaintiffs do not dispute that "minimiz[es/ing]" and "maximizing" are relative terms that beg the question of what baseline or benchmark to use—i.e., "minimiz[es/ing]" or "maximizing" **_compared to what_**?  *Id.* ¶¶ 48-49, 62-64; *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1395 (Fed. Cir. 2016); *Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*, No. 4:20-CV-1749, 2021 WL 2711987, at *5 (S.D. Tex. July 1, 2021) (finding "enlarged chamber" indefinite, as it "raise[s] the question: larger (or bigger) than what?" and "necessarily calls for some comparison

3

against some baseline"). The specification of a baseline, and an objective standard to measure against it, is critical because different baselines could lead to different conclusions about whether a resulting "time required for retrieving" has been "minimiz[d]" or a resulting "rate" has been "maximiz[ed]." Crovella Decl. ¶¶ 49, 64, 75, 80, 85; *JobDiva, Inc. v. Monster Worldwide, Inc.*, No. 13-CV-8229 KBF, 2014 WL 5034674, at *16 (S.D.N.Y. Oct. 3, 2014).

Without a baseline, *any* "time required for retrieving" could be considered "minimiz[ed]" when compared to an arbitrarily greater one because there is no upper bound on the amount of time required to retrieve information from mass storage. Crovella Decl. ¶ 49. Likewise, *any* "rate" for writing/erasing/retrieving could in theory be considered a "maximiz[ation]" when compared to some arbitrarily lesser "rate," because there is no lower bound on the rate for writing, erasing, or retrieving from mass storage. *Id.* ¶¶ 64, 75, 80, 85.

Because "minimiz[es/ing]" and "maximizing" are also terms of degree (as Plaintiffs do not dispute), a POSITA would have needed objective standards for determining *how much* of a reduction or increase, compared to the baseline, would or would not constitute "minimiz[es/ing] a time required for retrieving" or "maximizing" the specified "rate[s]." *Id.* ¶¶ 50, 64; *Advanced Display Techs. v. AU Optronics Corp.*, No. 6:11-CV-011, 2012 WL 2872121, at *14 (E.D. Tex. July 12, 2012) ("ADT's proposed construction itself provides no such guidance by using such unbounded and imprecise terms as 'minimizing' and 'increasing.' ADT essentially argues for a construction of an unbounded term of degree using other terms of degree.").

But a POSITA would not have been able to discern from the intrinsic evidence any objective standards for deciding either the relative (*i.e.*, benchmark) or degree questions with reasonable certainty. Crovella Decl. ¶¶ 47-51, 63-66. While the word "minimize" appears twice in the specification, neither instance supplies an objective standard for resolving these questions,

4

nor does the prosecution history or the knowledge of a POSITA.  *Id.* ¶¶ 51-56.  The same is true of "maximizing," which appears in one paragraph of the specification.  *Id.* ¶¶ 67-69.  Even if the Court were to adopt Plaintiffs' untimely constructions that "minimiz[es/ing]" means "reduce" and "maximizing" means "increase," a POSITA still would not be able to identify any standard or baseline against which to compare a "reduc[tion]" or "increase."  *Id.* ¶¶ 48-50, 64-69.

*Berkheimer v. HP Inc.*, which found the term "minimal redundancy" indefinite, is on point and controls.  881 F.3d 1360, 1363-64 (Fed. Cir. 2018).  As in *Berkheimer*, "the specification [of the '794 patent] contains no point of comparison for skilled artisans to determine an objective boundary" for the claimed "minimiz[es/ing]" or "maximizing," and "[t]he prosecution history does not add clarity." *Id.* at 1364.; Crovella Decl. ¶¶ 49, 52-53, 55, 67.  And the admission by Plaintiffs' expert that the claim language "does not require the minimization to be the absolute lowest possible and is instead based on the cache engine ***attempting*** to ***optimize*** the times and locations of when and where the blocks are written to disk" (Goodrich Decl. ¶¶ 41, 44), mirrors the patentee's concession in *Berkheimer* that "the invention ***attempts*** to ***minimize*** redundancy but may not in all cases achieve absolute elimination of redundancy," which the Federal Circuit cited as evidence of indefiniteness.  881 F.3d at 1364.

Plaintiffs can rebut none of this, nor have they even tried.  In fact, they fail even to acknowledge the expert declaration of Dr. Mark Crovella who, as a POSITA himself, details why "minimiz[es/ing]" and "maximizing" in claims 1 and 9 deprive a POSITA of reasonable certainty on the scope of the claims.  Instead, Plaintiffs offer a raft of circular and misleading arguments, untethered to the *Nautilus* standard.  First, Plaintiffs argue that the applicant and Examiner used the terms "minimizing" and "reducing" interchangeably during prosecution, yet

this is neither accurate[1] nor sufficient to overcome indefiniteness, given that Plaintiffs' belated constructions, "reduce" and "increase," suffer the same infirmities as indefinite terms of degree.

In lieu of an objective standard, Plaintiffs proffer "examples" from the specification of "techniques that reduce the time required to retrieve network objects from a cache engine's mass storage." *See* Plf. Br. at 8-10. This too misses the point, as "*non-limiting* examples," which Plaintiffs stress is all they are offering, "do not on their own expressly define the bounds—the *limits*—of the claim." *IQASR LLC v. Wendt Corp.*, 825 F. App'x 900, 906 (Fed. Cir. 2020). The question is not whether or not the specification enables a POSITA to practice the invention, but whether a POSITA can discern the boundaries of the claims with reasonable certainty. Neither Plaintiffs nor their expert even attempt to explain how a POSITA could extrapolate from the cited examples to determine the boundaries of the claims with reasonable certainty.

None of Plaintiffs' cited cases compel a different conclusion. In both *Tech Pharmacy Services, LLC* and *Endo Pharmaceuticals*, the claim language cited by Plaintiffs was found non-limiting. 2016 WL 6397358, at *20; 2014 WL 2859349, at *8 ("[T]he Court holds that the term 'with increased penetration' . . . is simply a statement of intended result or purpose, to be accorded no weight[.]"). And in *Abbott Laboratories*, indefiniteness was not even at issue; the parties offered competing constructions from which the court selected. 529 F. Supp. 2d at 912.

Lastly, Plaintiffs misconstrue the testimony of Netflix's IPR expert Dr. Henry Houh by omitting Dr. Houh's express qualification, from the same paragraph Plaintiffs cite, that "the '794

---

[1] In the April 12 Office Action, the Examiner discussed two concepts: "[minimizing] . . . a time it takes to locate the object in said cache memory" and "reducing the overall time between the client and server," finding the former to be "an essential step for" achieving Bhide's disclosure of the latter. Dkt 105-8 ("Plf. Br., Ex. H") at 4. To overcome Bhide, the applicant argued that Bhide's disclosure of "reducing the overall time between the client and server" and the '794 patent's claimed "minimizing" were **different**, because reducing latency between the client and server "is **not understood to be concerned with** minimizing a time required for a network cache to retrieve an object form a cache memory." Dkt. 105-9 ("Plf. Br., Ex. I") at 4 (emphasis added).

patent ***does not indicate the bounds*** of what qualifies as 'substantially minimizing' . . . mass storage retrieval times," but that "***[r]egardless of the bounds*** of what qualifies as 'substantially minimiz[ing],' a POSITA would have understood that these techniques—discussed in the '794 patent—fall squarely within the scope of the claims."  Exh. 2 ("Houh Decl.") ¶ 153 (emphasis added).  Contrary to Plaintiffs' insinuation, Dr. Houh "ha[d] not formed and d[id] not offer an opinion on the indefiniteness of the claims."  *Id.* ¶ 85.

### b. "substantially" (claim 1)

"Substantially," which modifies "minimizes a time required for retrieving said network objects from said mass storage" in claim 1, is an indefinite term of degree.[2]  Nothing in the intrinsic evidence supplies an objective standard—or even a point of reference—to permit a POSITA to determine, with reasonable certainty, whether or not the claimed "minimiz[ation]" has been "substantially" achieved.  Crovella Decl. ¶¶ 39-46.  Indeed, the word "substantially" (or any variation thereof) ***never*** appears in the specification.  *Id.* ¶ 41.  In analogous circumstances, the court in *KLA-Tencor* held "substantially maximize the strength of the output signal" to be indefinite because there was "no standard for determining what is substantially maximizing in the patent itself."  2011 WL 318123 at *3; *see also Core Wireless Licensing S.A.R.L. v. Apple Inc.*, No. 15-CV-05008-PSG, 2016 WL 3124614, at *12 (N.D. Cal. June 3, 2016) (finding "substantially impair the quality of the user information" to be indefinite); *Geodynamics, Inc. v. Dynaenergetics US, Inc.*, No. 2:15-CV-1546-RSP, 2016 WL 6217181, at *14–16 (E.D. Tex. Oct. 25, 2016) (finding "substantially equal to the total depth of penetration/(the tunnel)" indefinite

---

[2] Plaintiffs observe that "substantially" does not automatically render a claim invalid for indefiniteness, particularly when used as a term of approximation (*e.g.*, "substantially straight") instead of as a term of degree (*e.g.*, "substantially minimizes").  Plf. Br. at 12 & n.5.  But that proposition is inapplicable here, where Plaintiffs do not contend "substantially" is being used as a term of approximation.  *Id.*

where intrinsic evidence failed to define the bounds of "substantially equal").

Nor would the knowledge of a POSITA fill the gap.  As of the filing of the '794 patent, there was no generally accepted understanding of what "substantially" meant in connection with "minimiz[ing] a time required for retrieving" network objects from mass storage.  Crovella Decl. ¶ 40.  Nor could a lay understanding of "substantially" aid a POSITA in ascertaining objective boundaries, as the term may have any number of accepted lay meanings that are unbounded, such as "nearly but not entirely," "largely but not wholly," "a lot," "quite a bit," "meaningfully," or "tangibly."  *Id.* ¶¶ 43-46.  Pair any of those meanings with "minimizes a time required for retrieving" network objects from mass storage, and one will end up with a different, subjective result each time, "leaving the skilled artisan to consult the unpredictable vagaries of any one person's opinion." *Interval Licensing*, 766 F.3d at 1374.

Finding no support in the intrinsic evidence, Plaintiffs resort to expert testimony to conjure up two arbitrary "standards" for "substantially": (1) "multiple orders of magnitude," or (2) "reduc[ing] a time required for retrieving said network objects from said mass storage by an amount that is at least on the order of a time of a read access to the mass storage on the cache engine."  Plf. Br. at 13-15.  The Court should reject this "attempt to divine objective guidance from the specification via expert testimony [to try] sav[ing] the claims from a finding of indefiniteness." *Advanced Display Techs.*, 2012 WL 2872121, at *13.  But even if credited, these so-called standards—both seemingly plucked out of thin air—fail for lack of objective bounds.  To start, construing "substantially" as broadly covering "multiple orders of magnitude" only makes plain its indefiniteness, as even defined numerical ranges have been found insufficient in providing an objective standard for a term of degree. *See Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1217-18 (Fed. Cir. 1991) (finding expert testimony that "somewhere

8

between 155,000" and 160,000 "might" satisfy the term "at least about 160,000" insufficient).

Plaintiffs' backup "standard"—i.e., "reduc[ing] a time required for retrieving said network objects from said mass storage by an amount that is at least on the order of a time of a read access to the mass storage on the cache engine"—fares no better.  Plf. Br. at 14-15.  While Plaintiffs cite the invention's goals in the specification—*e.g.*, "attempt[ing] to optimize the times and locations when and where the blocks 200 are written to disk," (*id.* at 14)—nothing in this aspirational language even hints at an objective standard.  Moreover, Plaintiffs do not attempt to explain what "an amount that is at least on the order of a time of a read access to the mass storage on the cache engine" means, or how that would provide an objective standard by which a POSITA could determine if the required "minimiz[ation]" had been "substantially" achieved. *Id.*

Because nothing in the intrinsic or extrinsic record provides an objective standard for "substantially," the term should be found to be indefinite.

### 2.    "receiving a set of network objects in response to a first request to a server from a client" (claims 1, 9, 17)

Even Plaintiffs' description of the invention (content is stored in a cache engine before being served from it) succumbs to the basic point that for content to be stored in a cache engine, it must first be received at the cache engine.  Accordingly, Netflix proposes construing the "receiving . . ." limitation in claims 1, 9, and 17 to clarify for a lay juror what already logically and necessarily follows from the structure of the claim language: that the "receiving a set of network objects" step occurs: (1) "at the cache engine" (i.e., "receiving a set of network objects *at the cache engine* in response to a first request to a server from a client"); and (2) before the step of "maintaining said network objects in a cache memory in a cache engine."[3]

---

[3] Contrary to Plaintiffs' contention, the testimony of Netflix's expert in the pending IPR proceeding is in accord with this proposed construction.  Houh Decl. ¶¶ 86-90.

####     a.        The "receiving" step is performed "at the cache engine."

The intrinsic record compels construing the "receiving" step to clarify that it occurs at the cache engine.  To start, the language of the parallel system and memory claims confirms that the "receiving" occurs "at the cache engine."  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.").  Independent claims 20, 28, and 36—which are nearly identical to claims 1, 9, and 17, respectively, except styled as claims to "[a] cache engine"—require that the claimed cache engine include a processor which performs the "receiving" step via instructions stored in memory.  Independent claims 39, 47, and 55—which are likewise substantially identical to claims 1, 9, and 17, except styled as claims to "memory storing information including instructions"—similarly require that the "receiving" step is part of "control[ling] the cache engine."

Likewise, each time the word "receive" (including its other tenses, "receives" and "receiving") appears in the specification, it is used—***without exception***—to refer to "receiv[ing]" that is occurring at the cache engine.  *See, e.g.*, *id.* at 3:43-46 ("The cache engine 100 ***receives*** protocol messages 113 from a set of 'client' devices 111 to request network objects 114 to be retrieved from a set of 'server' devices 111." (emphasis added)).  The specification ***never*** uses the term "receive" in connection with anything other than the "cache engine."

Plaintiffs' opposition to Netflix's proposed construction hinges on a description of so-called "proactive" caching functionality, Plf. Br. at 3-5, yet even to the extent examples of such functionality may qualify as "embodiments," they were expressly disclaimed during prosecution.

While the specification states that a cache engine—in addition to "waiting for documents to be requested by the client devices"—can come "preloaded with selected network objects" or pre-fetch network objects before they are requested, '794 patent at 5:26-42, it is axiomatic that a

10

claim "does not need to cover every embodiment." *Pacing Techs., LLC v. Garmin Int'l*, 778 F.3d 1021, 1026 (Fed. Cir. 2015). "This is particularly true where," as here, "the plain language . . . of the claim does not appear to cover that embodiment." *Id.* Nothing in the plain language of asserted claims 1, 9, or 17, or their dependent claims, suggests they cover the preloading or pre-fetching of network objects, as Plaintiffs contend. Instead, the claim language plainly describes the specification's primary embodiment: receiving and storing network objects "in response to" client requests to servers for those network objects. *See* '794 Patent at 3:43-51.

Moreover, during prosecution, the applicant ***disclaimed*** what Plaintiffs now call "proactive caching." No fewer than six times in a January 31, 2000 Petition to Make Special pursuant to 37 C.F.R. § 1.102, the applicant distinguished prior art disclosures of "preloading" and "pre-fetching" as falling outside the scope of "caching" as claimed in the '794 patent, with statements such as: "However, ***prefetching objects is different from caching objects***."[4] Exh. 3 ("PTMS") at 9; *id.* at 5, 7, 11. In articulating <u>why</u> the caching claimed in the '794 patent differed from the proactive functionality on which Plaintiffs rely, the applicant explained:

> "A ***caching technique*** exploits the probability of multiple requests to the same page, but a ***pre-fetching technique*** exploits the use of knowledge of a client's requests to multiple pages. ***Therefore, the prior art references that discuss pre-fetching do not anticipate the present invention's claims concerning caching***."

PTMS at 11. Reading the claims to cover preloading and prefetching, as Plaintiffs now urge, violates the fundamental tenet that construction of a claim should "exclude any interpretation that was disclaimed during prosecution." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995); *see also SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1379-81 (Fed. Cir. 2021); *Sentry Prot. Prod., Inc. v. Eagle Mfg. Co.*, 400 F.3d 910, 915 (Fed. Cir. 2005).

---

[4] The applicant expressly stated that "preloading information is the same as pre-fetching information, which is different from caching information." PTMS at 5.

Finally, Plaintiffs' insistence that the "receiving a set of network objects" step can occur at a "client" device, *see* Plf. Br. at 5, is inconsistent with corresponding dependent claims. Claims 3 and 11 (which depend from claims 1 and 9, respectively) recite the additional step of "serving said network objects to said client in place of said server."  If, as Plaintiffs assert, the "receiving a set of network objects" already occurs at the client, adding a step of "serving said network objects to said client" would render the language in these dependent claims superfluous and possibly indefinite for failing to "specify a further limitation of the subject matter claimed" in their independent claims."  35 U.S.C. § 112(e); *see also Pilot Energy Sols., L.L.C. v. OXY USA Inc.*, No. 16-CA-00687-SS, 2017 WL 3726432, at *6 (W.D. Tex. Aug. 25, 2017).

### b.    Order of the steps

Netflix further seeks to clarify that the "receiving a set of network objects . . ." step must be performed before the step of "maintaining *said network objects*."  To determine whether a method claim requires a particular order of steps, courts first "look to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written," and if not, "next look to the rest of the specification to determine whether *it* directly or implicitly requires" step ordering.  *SCVNGR, Inc. v. DailyGobble, Inc.*, No. 6:15-CV-493-JRG-KNM, 2017 WL 4270200, at *10 (E.D. Tex. Sept. 26, 2017)).  In *Hytera Communications v. Motorola Solutions, Inc.*, 841 F. App'x 210 (Fed. Cir. 2021), the Federal Circuit held that a step of "preparing to transmit . . . in *a* timeslot" must occur before the step of "determining whether *the* timeslot is a current desired timeslot," because the former "grammatically provides antecedent basis for" the latter.  *Id.* at 213, 218 (emphasis added); *see also Wi-Lan, Inc. v. Apple, Inc.*, 811 F.3d 455, 462 (Fed. Cir. 2016).

As in these cases, the claim language here requires that the "receiving" occurs before the "maintaining," because the "receiving" step recites "*a* set of network objects," which provides

the antecedent basis for "*said* network objects" in the "maintaining" step.  The antecedent-basis dependency alone dictates, as a matter of grammar, that the "receiving" step must occur before the "maintaining" step.  *See Hytera*, 841 F. App'x at 218.  Indeed, "that the '[maintaining]' step says 'the' when it could have said 'a' reinforces [the] conclusion that it is meant to come after the '[receiving]' step."  *Id.*  Moreover, the logic of the claim language also requires "receiving a set of network objects" before "maintaining said network objects in a cache memory in a cache engine."  Before a cache engine can "maintain[] said network objects" in its cache memory, it must first obtain those network objects somehow.  The "receiving" step is the *only* aspect of the asserted claims that describes how the network objects are obtained and must therefore, as a matter of logic, take place before the "maintaining" step.

Because the logic and grammar of the claim language is dispositive, the Court "need not look further into the specification."  *Id.*  In any event, the specification of the '794 patent further confirms that "receiving" occurs before "maintaining":

> The cache engine 100 receives protocol messages 113 from a set of "client" devices 111 to request network objects 114 to be retrieved from a set of "server" devices 111.  *In response thereto*, the cache engine 100 issues protocol messages 113 to request those network objects 114 from one or more server devices 111, *receives those network objects* 114 and *stores* [i.e., maintains] *them in the cache* 102, and transmits those network objects 114 to the requesting client devices 111.

'794 patent at 3:42-51 (emphases added).

Although Plaintiffs recite the test for step-ordering in method claims, they do not even attempt to apply it, opting instead to mischaracterize Netflix's position as "based on two flawed assumptions."  Plf. Br. at 6.  Plaintiffs argue that Netflix assumes "that a cache engine cannot maintain network objects before they are requested by the client," but that is both incorrect and a non-sequitur.[5]  *Id.*  Under Netflix's step-ordered construction, nothing prevents clients from

---

[5] The question is whether "receiving" of network objects must occur before "maintaining" them,

requesting network objects after the "maintaining" step; indeed, dependent claim 4 adds a step of "serv[ing] [said network objects] to said client in place of said server in response to a second request from said client," which is consistent with "receiving a set of network objects" before "maintaining said network objects."  Second, Plaintiffs contend that Netflix's step-ordering construction is premised on the assumption that "the 'receiving' must be 'at the cache engine.'" *Id.*  But whether or not the "receiving" occurs "at the cache engine" is separately disputed by the parties, and even if it does not occur "at the cache engine," the "receiving" must still occur before "maintaining" as a matter of logic and grammar, as discussed above.

**B.    '014 Patent**

The '014 patent purports to provide "a system and method that provides reduced latency in a ***video signal processing*** system."  1:63-65 (emphasis added).   The invention described in the '014 Patent seeks to reduce latency in a video signal processing system by receiving—at a receiver—multiple streams of the same video content simultaneously, and then identifying one video information stream "[that,] when processed, is expected to result in the lowest latency (or delay) in presenting the requested unit of video information." *Id.* at 7:10–24.  The receiver conducts this analysis by examining each stream to determine which "will communicate the next access point" for the requested video—i.e., the next video frame for a given scene.  The receiver then decodes and/or converts the identified video stream to a "display driver signal" to present the video content to the user.  *Id.* at 7:52–63.  The patent offers no embodiment that claims to reduce latency other than one that requires the receiver to analyze access points to determine which video stream, when processed, is expected to result in the lowest latency.

---

not (as Plaintiffs suggest) whether any "***request[ing]***" of objects can occur before "maintaining."

### 1.    "when processed" (claim 1)

Netflix contends that "when processed" should be construed to mean "when decoded or converted into a display driver signal."  Plaintiffs, by contrast, would leave the meaning of the term for a lay juror to decide, but does not dispute that its meaning and scope includes *at least* Netflix's proposed construction.  *See* Plf. Br. at 16-17.  Plaintiffs' approach papers over a key dispute over the term's scope: whether processing encompasses activities other than decoding or converting a video stream.  The intrinsic evidence supports Netflix's proposed construction.

> Exemplary claim 1, the only asserted independent claim, provides:
>
> A method in a video receiving system for receiving video information, the method comprising:
>
>> receiving, by a receiver, a request by a user for a unit of video information;
>>
>> receiving, by the receiver, a plurality of video information streams, each of which represents the requested unit of video information;
>>
>> identifying, by the receiver, which of the plurality of video information streams, **when processed**, is expected to result in a lower latency in presenting the unit of video information; and
>>
>> processing, by the receiver, the identified video information stream to present the unit of video information.

As the Federal Circuit has made clear, the specification is "the primary basis for construing the claims." *Phillips,* 415 F.3d at 1315.  Netflix's construction comes directly from the specification, which provides that "[t]he receiver 130 may process the identified video information stream to present the unit of video information" by "decod[ing] the identified video information" or "convert[ing] the identified video information stream to a display driver signal, which the receiver may utilize to drive a display device that is coupled to the receiver."  '014 Patent at 7:52–59; *see also id.* at 17:21–25, 19:56–61.  In addition to conforming to the disclosures in the written description, Netflix's construction is consistent with the claim language, which recites processing in order "to present [a] unit of video information."  Decoding

15

and converting video information to a display driver signal do just that.  Netflix's construction of "when processed" therefore faithfully adheres to the intrinsic evidence.

Plaintiffs suggest that Netflix's proposed construction is unduly limiting because "the specification states that 'processing is not limited to decoding video-information streams and converting them to display driver signals.'"  Plf.' Br. at 16.  But the claimed invention is specifically directed to a "video signal processing system," '014 Patent at 1:63-65, in which "processing" includes generating a display driver signal, *see also* 2:56–61; 4:17–22.   Where, as here, the disclosures in the specification describing a particular claim term are directed to "the essence of the claimed invention," it is proper to construe that term in view of those disclosures. *Secure Web Conf. Corp. v. Microsoft Corp.*, 640 Fed. App'x. 910, 914–15 (Fed. Cir. 2016).[6]

In contrast, Plaintiffs contend that "when processed" should be understood according to its plain and ordinary meaning.  But there is inherent ambiguity in the plain and ordinary meaning of "processing," which is a highly generic term that has multiple meanings—many of which are irrelevant at best (and confusing at worst) outside the context of the claimed invention of the '014 Patent.  Moreover, Plaintiffs' proposal to assign "when processed" its "plain and ordinary meaning"—whatever meaning that has, if any—is inadequate because it "does not resolve the parties' dispute" over the scope of the term.  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).  The dispute here is particularly important because Plaintiffs' infringement contentions identify certain technical activities

---

[6]  Plaintiffs contend that the term should be construed to include "conditional access processing," an unclaimed embodiment.  *See Pacing Techs., LLC*, 778 F.3d at 1026.  "[C]onditional access processing" appears nowhere in the claims, including in dependent claims.  Nor does the specification define conditional access processing.  In the prior art, conditional access systems allowed television content providers to encrypt and decrypt television programming. *See, e.g.*, Exh. 13, U.S. Patent No. 7,930,712 at 2:36–52.  The '014 Patent contains no embodiment of access points for decrypting streams, much less how such access points reduce latency. *See Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006).

unrelated to "present[ing] . . . video information" as satisfying the "when processed" limitation.

Adopting Netflix's construction would resolve the question of whether the scope of processing

includes activities other than decoding or converting a video stream, and it would avoid the risk

of improperly deferring a dispute about the scope of the claims to the jury.  *See id.* at 1360; *see*

*also NobelBiz, Inc. v. Glob. Connect, LLC*, 701 F. App'x 994, 997 (Fed. Cir. 2017).

**C.       '419 Patent**

The '419 patent claims an apparatus comprising a "first node" that tells a plurality of

other nodes to perform operations "using computer code."  The first node does so without

"know[ing] which one of the plurality of nodes will perform the operation."  '419 patent at claim

1.  The apparatus performs these functions through "processors."  Claim 1 is representative:

1. An apparatus, comprising a first node of a network, the first node comprising:
      an interface operable to:
            communicate with a second node of the network; and
      one or more ***processors operable to***:
            tell a plurality of nodes to perform an operation comprising a procedure of an
            application, the plurality of nodes comprising a second node and one or more
            additional nodes;
            instruct the plurality of nodes how to perform the operation using computer code;
            and
            tell the plurality of nodes what to do with a result of the operation, and
            wherein the one or more processors does not know which one of the plurality of
            nodes will perform the operation.

**1.       The disputed terms of the '419 patent are means-plus-function terms.**

The terms "processors operable to" and "processors . . . further operable to" (claims 1,

11, 12, 17, 18, 20) fail to denote sufficient structure for performing their claimed functions and

should therefore be accorded means-plus-function treatment under section 112, paragraph 6.

Construing a term under section 112, paragraph 6 requires two steps.  First, the court

must "identify the claimed function."  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1351

(Fed. Cir. 2015).  Second, the court must "determine what structure … disclosed in the

specification corresponds to the claimed function." *Id.* "If the specification fails to disclose adequate corresponding structure, the claim is indefinite." *Synchronoss Techs.*, *Inc. v. Dropbox, Inc.,* 987 F.3d 1358, 1367 (Fed. Cir. 2021). "For . . . limitations implemented by a programmed general purpose computer or microprocessor, the corresponding structure described in the patent specification must include an algorithm for performing the function." *St. Isidore Research, LLC v. Comercia Inc.*, No. 2:15-CV-1390-JRG-RSP, 2016 WL 4988246, at *5 (E.D. Tex. Sept. 19, 2016).

In the context of the '419 patent, the claim language describes "processors" in purely functional language. That is, the term "processors operable to" serve as a "generic 'black box' for performing the recited computer-implemented functions." *Williamson*, 792 F.3d at 1350. This is highlighted by the '419 patent specification, which expands the definition of "processor" beyond any traditional, structural meaning: "Examples of processor include one or more computers, one or more microprocessors, one or more hardware or software applications, and/or other logic." '419 patent at 3:15-23. Such a broad definition, which refers to a "general category of whatever may perform" the recited functions, falls within the ambit of Section 112, paragraph 6. *See, e.g.*, *Egenera Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1374 (Fed. Cir. 2020) (rejecting appellant's argument that "logic" connoted sufficient structure because it was defined as "software, firmware, circuitry, or [a] combination thereof."). According to the unrebutted testimony of Dr. Freedman, "one of skill in the art could not discern any particular structure" from this "unconstrained definition." Exh. 4 ("Freedman Decl.") ¶ 34.

Moreover, "[t]he question is not whether a claim term recites any structure but whether it recites *sufficient* structure." *Egenera*, 972 F.3d at 1374 (emphasis in original). Here, neither the claim nor the specification explains the location of the processors, describes the physical

connection between the processors and other components, explains the communication between the processors and any other claimed features, or details how the processors are configured. Even assuming "processors" connoted some structure or class of structures, the '419 patent does not afford that term *sufficient* structure to "instruct" a plurality of nodes "how to perform [an] operation" without "know[ing] which one of the plurality of nodes will perform the operation." *See* Freedman Decl. ¶¶ 43-44 (noting the "contradictory nature of the asserted claims").

Plaintiffs argue that claim 1 recites sufficient structure because it discloses "objectives and operations" of the claimed processors.  Plf. Br. at 21.  But reciting objectives that the processors are "operable to" perform is no different than reciting their functions.  *MTD Prod. Inc. v. Iancu*, 933 F.3d 1336, 1343 (Fed. Cir. 2019) ("[T]he claim language reciting what the mechanical control assembly is 'configured to' do is functional."); *accord Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*, 989 F.3d 1002, 1006 (Fed. Cir. 2021) ("[T]he purely functional claim language reciting what the 'user identification module' is configured to do provides no structure.").  Plaintiffs' citation to this Court's decisions for *other* patents does not change the analysis for the '419 patent, where neither the claims nor the specification describe "processors" as anything other than a generic, black-box term.

### 2.    The disputed terms of the '419 patent are means-plus-function terms.

The '419 patent fails to adequately disclose corresponding structure for performing the recited functions.  Specifically, the patent does not disclose an algorithm for how the "first node" of claim 1 instructs other nodes in a network to perform operations "wherein the one or more processors does not know which one of the plurality of nodes will perform the operation." Indeed, Plaintiffs do not address step 2 of the *Williamson* analysis, conceding this point.  *Cf. Strong v. B.P. Expl. & Prod., Inc.*, 440 F.3d 665, 668 (5th Cir. 2006) (finding arguments not contested are implicitly conceded).  The claims reciting the disputed terms and their dependents

19

are therefore indefinite.  *See* Freedman Decl. ¶ 42 ("A person of skill in the art would not be able to discern any structure in the patent that corresponds to this functional limitation regarding not knowing which node will perform an operation"); *id.* ¶ 43 ("The specification contains no mathematical formula, prose, or other disclosure of an algorithm for how to carry out the numerous functions associated with the claimed 'processors'.").

### D.      '098 Patent

The '098 patent is directed to "a system and method that provide reduced latency in a video signal processing system." 1:42-52.  In light of the preference of users to minimize "the latency time between a video information request and presentation of the requested video information," the '098 patent purportedly reduces latency by transmitting "a first portion of the requested unit of video information to the video receiver for a first time period at a first transmission rate that is faster than a typical steady-state transmission rate for the unit of video information." *Id.* at 1:31-33, 1:53-62.

### 1.      "transmission rate" (claims 1, 7)

As patent applicant made clear during prosecution, the plain and ordinary meaning of the claimed "transmission rate" in the context of the alleged invention is "a rate at which data is transmitted from a server to a receiver."   Indeed, the inventor himself submitted a declaration stating "the 'initial transmission rate' in claim 8 is the rate that the server (the 'video transmission system' in claim 8) sends out the data." Exh. 5 ("Macinnis Decl. Under 37 C.F.R. § 1.132") at 5, 7; Exh. 6 ("Response to 10/08/15 Final Office Action") at 14, 16. Where, as here, the inventor defines the scope of a claim term, "the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316; *see also Ericsson Inc. v. TCL Communication Technology Holdings, Ltd.*, 161 F. Supp. 3d 438, 444 (E.D. Tex. 2015) (explaining that "the prosecution history provides evidence of how the PTO and the inventor understood the patent.").

The prosecution history supports Netflix's proposed construction for an independently sufficient reason: the patent holder clearly and unmistakably disclaimed any broader scope. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009). After three prior rejections, the USPTO rejected the claims under 35 U.S.C. § 103 based on a prior-art reference—Longfei—that disclosed the use of delays to correct for "jitters" and "noises" that arise downstream or mid-stream *after* a video playback has initiated. The USPTO found that Longfei's disclosure of these downstream delays "reads on the claim language" regarding the "initial transmission rate" of the '098 patent, especially "[i]n view of such broad Specification and claim." Exh. 7 ("10/08/15 Final Rejection") at 6.

In response to this rejection, the patent applicant submitted a reply supported by a declaration from the named inventor that expressly narrowed claim scope. *See* Response to 10/08/15 Final Office Action; Macinnis Decl. Under 37 C.F.R. § 1.132. To distinguish Longfei, the inventor claimed that whereas Longfei relates to activity occurring at ***the decoder***, the initial transmission rate of the '098 patent relates to activity occurring at ***the server***. *Compare* Macinnis Decl. Under 37 C.F.R. § 1.132 at 4 ("The 'delay' or 'variable delay' in Longfei is caused by functions in the network (e.g., queuing delays associated with the switches/routers, etc.) when the data stream is delivered to the decoder.") *with id.* at 5 ("In contrast, the 'initial transmission rate' in claim 8 is the rate that the server (the 'video transmission system' in claim 8) sends out the data."). Thus, the inventor explained that "[t]he 'initial transmission rate' at which the server sends out the data in claim 8 is ***fundamentally different*** from 'delays,' 'variable delays,' or 'jitters' of Longfei." *Id.* at 5 (emphasis added). Through this distinction, the inventor made clear that the initial transmission rate *is not the rate as measured* at the decoder, thereby disclaiming

that claim scope. As a result of these submissions, the Patent Office ultimately issued a notice of allowance. *See* Exh. 8 ("03/24/16 Notice of Allowance").

The applicant used this same narrowed definition of "transmission rate" to distinguish another disclosure in Longfei regarding bit rates.  In the same 10/08/15 Final Rejection, the USPTO found that Longfei's disclosure of "bit rates" satisfies the claim language's limitation of "initial transmission rate." 10/08/15 Final Rejection at 6. In response to that rejection over Longfei, the applicant explained that "***'the transmission rate' in Claim 8 is the rate that the server sends out the data***, e.g., the MPEG Transport Stream. As explained by Mr. Macinnis, such rates may be quite different from the rates that the streams were originally intended to be transmitted. "***Clearly, the 'bit rates' in Longfei is fundamentally different from 'the transmission rate' in Claim 8***."  Response to 10/08/15 Final Office Action at 16 (emphasis added). *See also* Macinnis Decl. Under 37 C.F.R. § 1.132 at 7. Where the inventor himself stressed these distinctions as "fundamental," the Court should hold the narrower claim scope as binding. *See RFID Tracker Ltd. v. Wal-Mart Stores Inc.*, 545 F. Supp. 2d 571, 580 (E.D. Tex. 2008) (finding prosecution history disclaimer where "[t]he applicant further stressed that this distinction was 'fundamental'"). In view of the intrinsic record, and the prosecution history disclaimer, Netflix's and the applicant's own construction should be adopted: a transmission rate is "a rate at which data is transmitted from a server to a receiver."

### 2. "first time period" (claims 1, 7) / "second time period" (claim 1)

The terms "first time period" and "second time period" are indefinite because the intrinsic evidence "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilis, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  The patent's purported inventiveness stems from transmitting "a first portion" of video to a receiver

22

"for a first time period at a first transmission rate that is faster than a typical steady-state transmission rate for the unit of video information," after which "[f]or a second time period after the first time period, a second portion of the unit of video information is transmitted to the remote video receiver at the typical steady-state transmission rate." Abstract, 1:31-33, 1:53-62. However, nowhere does the intrinsic record—the claims, the specification, or the prosecution history—define or limit the scope of these time periods, such as when each period begins and its duration.  Plaintiffs essentially concede that these terms do not provide a discernible boundary around the scope of the invention, stating that "[t]he claims do not specify what constitutes a 'first time period' or a 'second time period,'" and that "[i]n light of the claims, any period of time would infringe." Plf. Br. at 24.  Plaintiffs' brief is devoid of any citations to the specification or prosecution history concerning the scope of the terms "first time period" and "second time period."  *See Geodynamics, Incorporated v. Dynaenergetics US, Inc.*, No. 2:15-CV-1546-RSP, 2016 WL 6217181 at *16 (E.D. Tex. 2016) (Payne, J.) (finding the term "substantially equal" indefinite where "Plaintiff does not contend that the intrinsic evidence indicates the bounds of the phrase 'substantially equal'").

The unrebutted declaration of Netflix's expert Dr. Mark Crovella reinforces the conclusion that the claim terms "first time period" and "second time period" are indefinite. As Dr. Crovella explained, at the time of the purported invention of the '098 patent, there was no generally accepted understanding of what "first time period" or "second time period" meant. Crovella Decl.  ¶¶ 95, 112.  Moreover, the intrinsic evidence if anything further obscures these terms, by offering varying embodiments that are themselves ambiguous or, at times, contradictory, such that there is no meaningful standard by which to determine when a "first time period" or "second time period" begins and ends, and their duration. *Id.* at ¶¶ 94, 96, 111, 113.

23

Additionally, Dr. Crovella explains it is unclear from the patent *who* determines said "first time period" or "second time period," as the specification indicates that the "first time period" may be determined by the server, or by the client, or by both working together. *Id.* at ¶¶ 103, 115.

In short, the disclosures in the patent's specification do not inform, with any reasonable certainty, one of ordinary skill in the art about the scope of the claimed invention.  Courts have found similar time period terms to be indefinite. For example, in *Evicam International, Inc. v. Enforcement Video, LLC*, the Eastern District of Texas found the term "extended periods of time" in a limitation reciting "wherein said recording device is adapted to prevent said data from being overwritten for extended periods of time" was indefinite since there was no objective guidance in the specification as to what constituted an "extended period of time," and even a passing reference to "48 hours" was not an example of an "extended period of time," because the claim was subject to multiple interpretations. 2016 WL 6470967, *18-19 (E.D. Tex. 2016).

Likewise, in *Power Integrations, Inc. v. ON Semiconductor Corporation*, the Northern District of California found that the term "less than a maximum period of time" was indefinite because "[a] POSITA, looking to the specification and the prosecution history, could not with reasonable certainty determine the scope of the claim" and because "predefined time required by the term could be 'ten minutes,' 'half a second,' 'one second.'" 2018 WL 5603631 at *13 (N.D. Cal. 2018) (citing *Nautilis, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014)).  The Court further found that "splitting of the maximum period 'into two discrete periods'" did not "cure this deficiency" since "those periods are likewise indefinite; nothing in the specification indicates how long each period can be." *Id.*  The terms at issue here face the identical problem— either period could be "ten minutes," "half a second," "one second," and "nothing in the specification indicates how long each period can be." *Id.*  These cases are directly applicable

24

here because, as Plaintiffs concede and as Dr. Crovella's expert declaration demonstrates, there is no way to tell when the first time period ends and the second time period begins.

Plaintiffs summarily cite *Signal IP v. American Honda Motor Co., Inc.* for the proposition that the time period terms are not indefinite.  *Signal*, however, is inapposite.  There, the specification actually contained "a detailed example of an appropriate timeframe." 2015 WL 5768344 at *31 (C.D. Cal. 2015).  By contrast, here, neither the claims nor the specification define with reasonable certainty the boundaries of the "first time period" or "second time period," and Plaintiffs do not argue otherwise.  Lacking any discernible boundaries on scope, the Court should find "first time period" and "second time period" indefinite. *See Dow Chemical Co. v. Nova Chemicals Corp. (Canada)*, 803 F.3d 620, 633-635 (Fed. Cir. 2015) (finding term indefinite where "[n]either the patent claims nor the specification here discusses the four methods [for calculating said term] or provides any guidance as to which method should be used or even whether the possible universe of methods is limited to these four methods").

    **E.**    **'938 Patent**

        **1.**    **"computing devices" (claims 1-14, 16-18, 20-30)**

            **a.**    **Functional recitation**

All independent claims of the '938 patent recite the generic, nonce term "computing devices" without any corresponding structure.  Therefore, they are subject to means-plus-function construction under 35 U.S.C. § 112, ¶ 6.  "In making the assessment of whether the limitation in question is a means-plus-function term subject to the strictures of § 112, para. 6, . . . the essential inquiry is . . . whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure."  *Williamson,* 792 F.3d at 1348.  Dr. Psounis's opinion that the term "computing devices" does not connote sufficiently definite structure stands unrebutted by other evidence. *See id.* at 1350.  As

Dr. Psounis explains: "one of ordinary skill in the art would consider the term 'computing devices' as used in the claims to amount to nothing more than a 'black-box' recitation for performing the claimed functions." *See* Exh. 9 ("Psounis Decl.") ¶ 30.  Plaintiffs offer no expert opinion to the contrary.  Nor could they.  "Computing devices" is defined, in the claims, purely by its functions.  "Devices" is generic, and the qualifier "computing" fails to add any specificity.  Further, the claims fail to describe how the computing devices interact with other components, and the surrounding claim language therefore confers no additional structure.

Many courts, including this district, have found terms like "computing devices" to lack sufficiently definite structural connotation.  For example, this Court has held that "the word 'device' does not provide any indication of structure because it sets forth the same black box recitation of structure for providing [a] specified function as if the term 'means' had been used." *Advanced Marketing Syst., LLC v. CVS Pharmacy, Inc.*, No. 15-cv-134-JRG-KNM, 2016 WL 1741396, at *18 (E.D. Tex. May 3, 2016); *see also, e.g., Widevine Techs., Inc. v. Verimatrix, Inc.*, No. 07-cv-321, 2009 WL 3734106, at *14 (E.D. Tex. Nov. 4, 2009) ("The claim provides no structural context and describes each 'device' by the functions that it performs, which means that one of skill in the art would have no recourse but to turn to the [patent's] specification to derive a structural connotation."); *Personal Audio, LLC v. Apple, Inc.*, No. 09-cv-111, 2011 WL 11757163, at *21 (E.D. Tex. Jan. 31, 2011) ("If 'computer' or 'processor' is insufficient structure to define the scope of a means-plus-function limitation, the word 'processor' cannot describe sufficient structure when recited directly in a claim limitation itself."); *Soque Holdings Ltd. v. Keyscan, Inc.*, No. 09-2651 MHP, 2010 WL 2292316, at *12 (N.D. Cal. 2010) ("[C]omputer" does not adequately describe a specific structure."); *Pi-Net Int'l v. JP Morgan Chase*, No. 12-282-SLR, 2014 WL 1997039, at *13 (D. Del. May 14, 2014) ("[T]he present

claims and written description fail to provide any detail regarding the 'computer system' limitation, including its interaction with any other components of the claimed system."); *Sarif Biomed. LLC v. Brainlab, Inc.*, No. 13-846-LPS, 2015 WL 5072085, at *6 (D. Del. Aug. 26, 2015) ("Claim 1's 'computer adapted to' perform this function is an insufficient disclosure of structure as there is no disclosure as to how the computer would perform the function.").

Plaintiffs nonetheless argue that "computing devices" connotes structure because (1) Dr. Psounis is able to describe "computing devices," and (2) a definition exists for the term "device." *See* Plf. Br. at 26-27.  But that is not the standard.  Instead, the proper inquiry is "whether the words of the claim are understood by persons of ordinary skill in the art to have a ***sufficiently definite meaning*** as the name for structure."  *Williamson,* 792 F.3d at 1348 (emphasis added).[7] Here, Dr. Psounis's description of "computing devices" as "literally any implementation of hardware or software, or combination thereof, that computes," and his citations to sprawling definitions for the term "device," underscore the term's lack of any definite structure.  *See* Psounis Decl. ¶ 30; 30, n.1; *see also* '938 at 15:16-50.

The cases cited by Plaintiffs are not analogous.  For example, in *Skyy, Inc. v. Mindgeek*, the claims did not recite functions for the "wireless device means" to perform, making the term both substantively and structurally distinct from the instant case.  859 F.3d 1014, 1020 (Fed. Cir. 2017).  Plaintiffs also rely on *Inventio AG v. ThyssenKrupp Elevator Ams. Corp.*, which was overruled by *Williamson.*  792 F.3d at 1349.  In *SEVEN Networks, LLC v. Apple Inc.*, the claims recited "numerous operations, interrelationships, and configuration details" and the plaintiff

---

[7] The absence of the word "means" does not determine whether the claim should be subject to means-plus-function construction.  *See Williamson v. Citrix Online LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015).  Moreover, claim 30 of the '938 patent is an explicit means-plus-function claim that Plaintiffs ceased asserting upon filing their opening brief.  *See* Ex. 10 ("Letter from Rich"). The striking parallels between claim 30 and the other independent claims (1, 23, and 27) further support the conclusion that "computing devices" has no more structure than "means."

"submit[ted] evidence that the term 'processor' has structural meaning in the relevant arts"—

neither of which is true here.  No. 19-CV-115-JRG, 2020 WL 1536152, at *48, 50 (E.D. Tex.

Mar. 31, 2020).  And in *Samsung Electronics v. Prisua Engineering*, the defendant failed to

provide supporting evidence and had previously argued to the PTAB that the term was "'an

image processing device that people in the art are generally familiar with.'"  948 F.3d 1342,

1354 (Fed. Cir. 2020).  Here, the opposite is true.  *See* Psounis Decl.; Exh. 11 ("Gray Decl. from

IPR2021-01334") ¶¶ 59-63.

        **b.**        **Disclosure of corresponding structure**

After the Court determines that a term is subject to § 112, ¶ 6, it must next determine

whether the specification discloses sufficient structure.  *Williamson*, 792 F.3d at 1351-52.

"Structure disclosed in the specification qualifies as 'corresponding structure' if the intrinsic

evidence clearly links or associates that structure to the function recited in the claim."  *Id.* at

1352.  Here, the specification discloses a limited set of structures that comprise "computing

devices"—*i.e.*, certain personal electronic and local-networked user devices—as explained in

Dr. Psounis's declaration, and as is undisputed.  In particular, the specification discloses that

"personal electronic devices"—comprised of "a portable handheld communication device, such

as a Smartphone, a cellphone, a PDA, [or] a multimedia device…"—perform the function of

identifying the user based on login information.  '938 at 4:10-15; 4:40-44; 8:10-14.  The

specification similarly discloses structures for the other recited functions.  *See* Psounis Decl.

¶¶ 21-28, 32.  If not so limited, the "broad, catchall attempts to encompass all conceivable

implementations of the claimed invention in any kind of hardware or software, or any

combination thereof," would render the term indefinite.  Psounis Decl. at ¶¶ 30, 33.

The prosecution history also supports limiting the structure to user devices.  During

prosecution, the PTAB rejected claims in a predecessor application to the '938 patent as

anticipated by the "Mittal" prior art, which disclosed "peer to peer" sharing (*i.e.*, sharing among client-side devices) of user information.  *See* Exh. 12 ("Mittal Excerpt from FH").  To overcome the rejection, Plaintiffs conceded the "peer to peer" sharing nature of the claims, and instead argued that Mittal did not disclose "user configuration information" as required by the claims. *Id.*  Taken together, the '938 patent and its prosecution history mandate construing "computing devices" to be limited to the structures disclosed in the specification.

### 2.   "the login information received from the first computing device" (claims 5, 21)

Plaintiffs do not dispute that "the login information received from the first computing device" is nowhere to be found in claim 1, from which claims 5 and 21 depend.  As a result, the term lacks an antecedent basis and is indefinite.  *See, e.g.*, *Personalized Media Commc'ns, LLC v. Google LLC*, No. 2:19-cv-00090-JRG, 2020 WL 1666462, at *18 (E.D. Tex. Apr. 3, 2020); *Hitachi Maxell, Ltd. v. Top Victory Elecs. Co.*, 143 F. Supp. 3d 485, 517 (E.D. Tex. 2015).

Facing a plainly indefinite term, Plaintiffs contend, without any support, that one of skill in the art would "understand that when the system provides media content to the first computing device, it does so because the user logged in from that device."  Plf. Br. at 28.  But the claim language is not so limited, and the specification contemplates the use of Bluetooth technology, which would permit, for example, a user to stream content on her Bluetooth-connected speakers, even though she had logged into her laptop computer (a different device).  *See, e.g.*, '938 Patent at 2:45-52 ("For example, Bluetooth technology may be utilized to connect a laptop computer or a handheld wireless terminal to a peripheral device, such as … headphone[s]"); 5:6-12; 6:17-26. Nor has Netflix or its IPR expert (Dr. Gray) taken a contrary position.  Indefiniteness under Section 112, ¶ 2, is not a permissible ground upon which to petition for *inter partes* review.  *See* 35 U.S.C. § 311(b).  Netflix was not permitted to and did not raise indefiniteness as a ground in

IPR.  Dr. Gray does not address whether the outer boundaries of a claim term may be discerned with reasonable certainty.  Instead, Dr. Gray opines regarding **_prior art_** that reads on the claims, regardless of the claims' (lack of) outer bounds, and Plaintiffs mischaracterize his opinions as if they relate to ascertaining the claims' boundaries.

### 3.  "third system"

Basic logic requires the existence of a "second system" before a reference to a "third system" makes sense.  Claim 17, however, recites a "third system" even though there is no "second system" in the claims (or in the patent whatsoever).  The term therefore lacks an antecedent basis and is indefinite.  *See, e.g.*, *Personalized Media*, 2020 WL 1666462, at *18; *Hitachi*, 143 F. Supp. 3d at 517 (E.D. Tex. 2015).  Plaintiffs argue that there is "no need" to recite a second system because "[i]f at least two systems are connected to the system of claim 1, one of them is necessarily a 'third system' that can satisfy claim 17."  Plf. Br. at 29.  Plaintiffs' argument is incomprehensible.  Multiple systems are not discussed anywhere in the claims.  In addition, Plaintiffs once again mischaracterize Dr. Gray's comments—which discussed the teachings of **_prior art_** that encompassed at least three systems—as if it pertains to the claim language itself.

Respectfully submitted,

KEKER, VAN NEST & PETERS LLP

Dated:  September 30, 2021

By:    */s/ Sharif E. Jacob*
ROBERT A. VAN NEST
LEO L. LAM
MATTHIAS A. KAMBER
PAVEN MALHOTRA
SHARIF E. JACOB
EDWARD A. BAYLEY
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188

Melissa R. Smith
State Bar No. 24001351
GILLAM & SMITH LLP
303 S. Washington Avenue
Marshall, Texas 75702
Telephone:  (903) 934-8450
melissa@gillamsmithlaw.com

*Attorneys for Defendant Netflix, Inc.*

31

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 30th day of September, 2021, all counsel of record who are deemed to have consented to electronics service ae being served with a copy of this document through the court's CM/ECF system under Local Rule CV-5(a)(3).

*/s/ Melissa R. Smith*

32